UNITED STATES of America,
Appellee,

v.

Jerome E. ROYAL, Defendant,
Appellant.

No. 98–1825.

United States Court of Appeals,
First Circuit.

Heard Jan. 5, 1999.

Decided April 2, 1999.

James E. Carroll, with whom Sheila High King and Cetrulo & Capone LLP were on brief, for appellant.

Nadine Pellegrini, Assistant U.S. Attorney, with whom Donald K. Stern, U.S. Attorney, was on brief, for appellee.

Before SELYA, Circuit Judge, CAMPBELL, Senior Circuit Judge, and LYNCH, Circuit Judge.

LYNCH, Circuit Judge.

After prevailing, in a previous appeal to this court, on his motion to inspect the jury selection records of the Eastern Division of the District of Massachusetts, Jerome E. Royal moved for a new trial, claiming that the selection process used to pick the jury panel that convicted him of conspiracy and mail fraud violated the Sixth Amendment and the Jury Selection and Service Act ("the Act"). The district court denied this motion. Royal appeals, urging that the selection process produces systematic underrepresentation of blacks, an argument which depends upon changing the law of this Circuit governing evaluation of a jury selection challenge. We decline the invitation and affirm.

I

The facts relating to Royal's conviction and first appeal are set forth in *United States v. Royal*, 100 F.3d 1019 (1st Cir. 1996), and we recount only the most relevant aspects here.

Royal was indicted in 1992 on charges of mail fraud, conspiracy to commit mail fraud, and aiding and abetting. *See id.* at 1023. When the case was called for trial, Royal made various motions relating to the jury venire and the jury selection process for the Eastern Division. The district court denied Royal's motions to inspect the jury records of the Eastern Division, suggesting "that, in order to inspect the requested records, Royal was required to make a showing that he would be able to satisfy the three prongs of [the test for establishing a prima facie violation of the fair cross-section requirement]." *Id.* at 1024. The case proceeded to trial; the jury found Royal guilty of one count of conspiracy and eight counts of mail fraud. *See id.* at 1023.

Royal appealed. This court rejected Royal's challenges to the jury charge, the sufficiency of the evidence, and various aspects of his sentence, but reversed the

district court's denial of his motions to inspect the jury records and remanded for further proceedings. *See id.* at 1022. Relying on 28 U.S.C. § 1867(f) and *Test v. United States,* 420 U.S. 28, 95 S.Ct. 749, 42 L.Ed.2d 786 (1975), this court stated that "a defendant, such as Royal, challenging the jury selection procedures has an unqualified right to inspect jury records.... [A] district court may not premise the grant or denial of a motion to inspect upon a showing of probable success on the merits of a challenge to the jury selection provisions." *Royal,* 100 F.3d at 1025. The court therefore "remand[ed] the case with instructions to allow Royal access to [the jury records] ... in order to support a motion to strike the jury venire" and authorized Royal to "move for a new trial under 28 U.S.C. § 1867(a)." *Id.* at 1025–26.

Upon remand to the district court, the district judge made provisions for permitting Royal to inspect "[t]he contents of records or papers used by the jury commission or clerk in connection with the jury selection process" for 1994, the year relevant to Royal's particular jury. 28 U.S.C. § 1867(f), *quoted in Royal,* 100 F.3d at 1025–26. These provisions included a substantial time period for Royal to examine and evaluate the materials as well as the grant of Royal's motions for appointment and compensation of an expert. Eventually, on December 24, 1997, Royal moved for a new trial, claiming that he "was denied his Sixth Amendment right under the United States Constitution and his statutory right under the Jury Selection and Service Act, 28 U.S.C. § 1861 *et seq.,* to a jury selected at random from a fair cross section of the community." *United States v. Royal,* 7 F.Supp.2d 96, 97–98 (D.Mass.1998) (internal quotation marks omitted).

Royal's claim of constitutional and statutory flaws in the selection process was based on the operation and implementation of the Amended Jury Plan for the District of Massachusetts, which is dated September 6, 1989. *See generally* 28 U.S.C. § 1863(a) ("Each United States district court shall devise and place into operation a written plan for random selection of grand and petit jurors that shall be designed to achieve the objectives of ... and that shall otherwise comply with ... this title."). This Plan divides the district into three divisions for jury selection purposes, one of which is the Eastern Division at issue in this case (consisting of Barnstable, Bristol, Dukes, Essex, Middlesex, Nantucket, Norfolk, Plymouth, and Suffolk counties). The source for selection of jurors in each division is "the numbered local resident lists submitted annually to the Office of the Jury Commissioner for the Commonwealth of Massachusetts in accordance with Massachusetts General Laws Chapter 234A," which the Plan states "includes all registered voters, supplemented by all residents not registered to vote." [1] Names are randomly selected from the resident lists and placed in the Master Jury Wheel. At this stage, the Plan provides for a one-step summoning and qualification process, as authorized by the Act, *see* 28 U.S.C. § 1878, and specifies various categories of potential jurors who are unqualified, exempt, and eligible for excuse, in accordance with 28 U.S.C. §§ 1863, 1865, and 1866. The Plan also, inter alia:

(1) requires the Jury Clerk to note the "determination" whether a prospective juror is unqualified, exempt, or excused "in the space provided on the juror qualification form,"

(2) permits the Clerk to "grant temporary excuses to prospective jurors on the grounds of undue hardship or extreme inconvenience,"

---

1. Section 10 of Chapter 234A provides: "On or before the first day of June of each year, each city and town shall make a sequentially numbered list of the names, addresses, and dates of birth of all persons who were seven-

teen years of age or older as of the first day of January of the current year and who resided as of the first day of January of the current year in such city or town."

(3) mandates that temporarily excused jurors be resummoned "at the conclusion of the excuse period," and

(4) provides that "[t]he Court will, from time to time, review the actions of the Clerk [in granting such temporary excuses] ... to determine whether or not there is an abuse of the discretion granted to the Clerk."

Upon inspection of the 1994 records, Royal concluded that 21,900 prospective jurors were summoned, that 18,451 returned their juror qualification forms, and that 415 of the forms were returned by individuals identifying themselves as black and 1,185 were returned by individuals who declined to designate their race. The difference between 18,451 and 21,900 is accounted for by the fact that 899 summonses were nondeliverable and 2,550 were not returned by the recipients.

Of the 415 identifiable black prospective jurors who returned qualification forms, Royal discovered, 41 were disqualified and 13 were exempt from service. One hundred and four of the remaining black prospective jurors were excused at some point during the selection process; 10 of those excuses were granted without notation of a request or a reason for the excuse in the records examined.

At juror orientation, Royal found, some 5,571 prospective jurors appeared, of whom 167 were black. Royal determined that 24 prospective black jurors were labeled no-shows and 66 did not appear because their panels were cancelled due to lack of necessity.

To help explain these numbers, Royal had an expert analyze the data. Royal's expert analyzed the zip codes of the nondeliverable and nonreturned summonses and concluded that summonses failed more often in areas in which the size of the black population is relatively significant. For instance, the expert concluded that summonses failed twice as often in areas in which more than 50% of the population is black than they did in areas in which

blacks make up less than 2% of the population. The expert also concluded that the Massachusetts resident lists were flawed and undercounted black residents.

On June 12, 1998, the district court denied Royal's motion for a new trial. *See Royal*, 7 F.Supp.2d at 106–07. The court found Royal's calculation of black underrepresentation faulty because, inter alia, that calculation compared the number of self-identified blacks who returned questionnaires with the total number of individuals (of whatever race) summoned rather than merely with the total number who returned questionnaires. *See id.* at 105. At any rate, the court concluded, Royal's new trial motion failed, even assuming his calculation was correct, because the levels of disparity that Royal had identified were not objectionable under either the Sixth Amendment or the Act. *See id.* at 106.

The court also rejected the arguments that the Massachusetts resident lists used as a source for selecting jurors were insufficient because they undercounted blacks, that the alleged failure to account for undeliverable or nonreturned responses violated the Act, and that the Jury Clerk committed a material abuse of discretion by failing to list a reason for excusing ten black prospective jurors. *See id.* at 101–03.

Royal appeals the district court's denial. We review the district court's findings of fact for clear error and its conclusions of law de novo. *See United States v. Paniagua–Ramos*, 135 F.3d 193, 197 (1st Cir.1998); *Royal*, 100 F.3d at 1023–24; *United States v. Shinault*, 147 F.3d 1266, 1271 (10th Cir.), *cert. denied*, —— U.S. ——, 119 S.Ct. 459, 142 L.Ed.2d 411 (1998). In the end, any dispute over the facts is essentially moot. This case turns on the choice of statistical methodology to determine whether there is underrepresentation of black persons.

## II

"[T]he American concept of the jury trial contemplates a jury drawn from a fair

cross section of the community," *Taylor v. Louisiana*, 419 U.S. 522, 527, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975), and "the fair-cross-section requirement [is] fundamental to the jury trial guaranteed by the Sixth Amendment," *id.* at 530; *see also Holland v. Illinois*, 493 U.S. 474, 480, 110 S.Ct. 803, 107 L.Ed.2d 905 (1990). The Sixth Amendment provides: "In all criminal prosecutions, the accused shall enjoy the right to a ... trial[ ] by an impartial jury of the State and district wherein the crime shall have been committed...." U.S. Const. amend. VI; *see also* 28 U.S.C. § 1861 ("It is the policy of the United States that all litigants in Federal courts entitled to trial by jury shall have the right to grand and petit juries selected at random from a fair cross section of the community in the district or division wherein the court convenes.").

■ This requirement of a fair cross-section, however, does not guarantee that juries be "of any particular composition," *Taylor*, 419 U.S. at 538, or that "venires ... [be] a substantially true mirror of the community," *Barber v. Ponte*, 772 F.2d 982, 997 (1st Cir.1985) (en banc). All that is required is that "the jury wheels, pools of names, panels, or venires from which juries are drawn must not systematically exclude distinctive groups in the community and thereby fail to be reasonably representative thereof." *Taylor*, 419 U.S. at 538.

■ In order to make a prima facie case of a violation of the fair cross-section requirement, a defendant must show:

(1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

*Duren v. Missouri*, 439 U.S. 357, 364, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979), *quoted in United States v. Hafen*, 726 F.2d 21, 23 (1st Cir.1984); *see also United States v. Foxworth*, 599 F.2d 1, 3–4 (1st Cir.1979).[2] This test applies to Royal's fair cross-section claims under both the Sixth Amendment and the Act. *See, e.g., Shinault*, 147 F.3d at 1270–71; *Hafen*, 726 F.2d at 23 n. 1.

■ There is no dispute that Royal has satisfied the first prong of this test; blacks are unquestionably a "distinctive" group for the purposes of a fair cross-section analysis. *See Hafen*, 726 F.2d at 23 (citing *Peters v. Kiff*, 407 U.S. 493, 498–99, 92 S.Ct. 2163, 33 L.Ed.2d 83 (1972)).

With respect to the second prong, courts and commentators have discussed various forms of statistical analysis that may be used to demonstrate that representation is not "fair and reasonable in relation to the number of such persons in the community." *See, e.g.*, Peter A. Detre, Note, *A Proposal for Measuring Underrepresentation in the Composition of the Jury Wheel*, 103 Yale L.J.1913, 1917–18 (1994). Only two of these forms—"absolute disparity" and "comparative disparity"—are at issue in this case.[3] Absolute disparity measures

2. If such a prima facie case is made, the government can rebut it by showing "that a significant state interest [is] manifestly and primarily advanced by those aspects of the jury-selection process ... that result in the disproportionate exclusion of a distinctive group." *Duren*, 439 U.S. at 367–68. It is worth noting that although intentional discrimination is an element of an equal protection challenge to jury selection, it is not an element of a Sixth Amendment fair cross-section challenge. *See id.* at 368 n. 26.

3. The debate about use of absolute disparity versus comparative disparity has existed for at least 25 years. *See Foster v. Sparks*, 506 F.2d 805 (5th Cir.1975). The science of statistics may develop other methodologies over time which do not suffer from the acknowledged flaws of these two methods. Our case involves only these two methodologies—the only two discussed by the parties—and our endorsement of one should not be taken as a statement that it is the best of all possible methodologies. *Cf. United States v. Rioux*, 97

the difference between the percentage of members of the distinctive group in the relevant population and the percentage of group members on the jury wheel. *See Hafen*, 726 F.2d at 23 (calculating "the difference between the percentage of eligible blacks in the population and the percentage of blacks on the master wheel"); *see also United States v. Pion*, 25 F.3d 18, 23 n. 5 (1st Cir.1994) (defining the absolute disparity standard as "the gross spread between the percentage of eligible Hispanics ... in the relevant population and the percentage of Hispanic representation on the Master Jury Wheel"); *cf. United States v. Rioux*, 930 F.Supp. 1558, 1565–68 (D.Conn.1995) (stating that "[t]he identified systematic defect defines ... the particular pool"), *aff'd*, 97 F.3d 648 (2d Cir. 1996).

In contrast, comparative disparity "measures the diminished likelihood that members of an underrepresented group, when compared to the population as a whole, will be called for jury service." *Ramseur v. Beyer*, 983 F.2d 1215, 1231–32 (3d Cir. 1992). It is calculated by dividing the absolute disparity percentage by the percentage of the group in the population. *See Hafen*, 726 F.2d at 23 (stating that comparative disparity is measured by calculating "the percentage difference between the proportion of blacks eligible to serve as jurors ... and the shortfall in black representation"); *see also Pion*, 25 F.3d at 23 n. 5.

For fifteen years, this Circuit has rejected comparative disparity analysis and applied absolute disparity analysis in cases similar to the case at hand, and we have recently reaffirmed this position. In *United States v. Hafen*, 726 F.2d 21 (1st Cir. 1984), in which this court upheld a previous version of the selection plan for the Eastern Division, the court assumed that, as Hafen contended, 3.73% of the Eastern Division's over-eighteen population was black and only 1.714% of the master jury wheel was black. *See id.* at 23. The court concluded, however, that the resulting 2.02% absolute disparity was "insufficient to show underrepresentation," citing cases from other circuits that accepted absolute disparities of up to 10%. *Id.* The court recognized that the absolute disparity in the case would be small "even if every black in the region were excluded from jury service," and "acknowledge[d] the possibility that the comparative disparity calculation might be a useful supplement to the absolute disparity calculation in some circumstances." *Id.* at 23–24. However, *Hafen* refused to employ a comparative disparity calculation, explaining that such a calculation "distorts reality" in situations in which "a very small proportion of the population is black."[4] *Id.* at 24 (quoting *United States v. Whitley*, 491 F.2d 1248, 1249 (8th Cir.1974)) (internal quotation marks omitted); *see also id.* ("[T]he smaller the group is, the more the comparative disparity figure distorts the proportional representation."). *Hafen* distinguished *LaRoche v. Perrin*, 718 F.2d 500 (1st Cir.1983), which did use a comparative calculation, because that case "did not adopt the comparative disparity analysis to deal with ... the situation in which the group allegedly underrepresented forms a very small proportion of the total population." *Id.* at 24 n. 3. Finally, the court also noted an additional reason why the comparative disparity calculation was inappropriate: "A small variation in the figures used to calculate comparative disparity can produce a significant difference in the result, and the appellees have demonstrated that there is reason to doubt the accuracy

F.3d 648, 655–56 (2d Cir.1996) (rejecting statistical decision theory and comparative disparity in favor of "absolute disparity/absolute numbers").

4. For instance, in an extreme example, if the community contained only one member of a particular distinctive group, and that member was not included in the jury wheel, the comparative disparity would be 100%, even though a jury without that member "would clearly form a 'fair cross section' of the community." *Hafen*, 726 F.2d at 24.

of the figures on which appellant would have us rely." *Id.* at 24.

*Hafen*'s rejection of comparative disparity was reaffirmed in *United States v. Pion,* 25 F.3d 18 (1st Cir.1994), which also involved the Eastern Division's Plan. Pion argued that his Sixth Amendment rights were violated because, although 4.2% of the Eastern Division's residents were Hispanic, "only 0.99% of all persons responding to the juror questionnaire during 1992, and 0.80% of those appearing for juror orientation, were Hispanic." *Id.* at 22. The court found that Pion failed to establish "systematic exclusion," the third prong of the *Duren* test, since "there can be no reasonable inference that the relatively small Hispanic underrepresentation at jury orientation is attributable to anything other than the randomness of the draw from either the resident lists or the Master Jury Wheel." *Id.* at 22–24. Although the court did not rely on the second prong of the *Duren* test in rejecting Pion's claim, it rested its conclusion that the underrepresentation was "relatively small," *id.* at 24; *see also id.* at 24 n. 7, on what Pion calculated was a 3.4% absolute disparity between the "Hispanic representation in the relevant general population" and the "Hispanic representation among persons appearing for juror orientation," *id.* at 23. The court made a point of citing *Hafen*'s reasons for rejecting a comparative disparity calculation where the underrepresented group is small or where the accuracy of the relevant figures is in doubt. *See id.* at 23 & n. 5 (stating that Pion's figures, which produced a comparative disparity of 81%, were not accurate). The vitality of *Pion* has recently been reaffirmed. *See United States v. Rodriguez,* 162 F.3d 135, 148 (1st Cir.1998); *United States v. Lopez,* 147 F.3d 1, 2 (1st Cir.1998).

This court's choice of absolute disparity over comparative disparity in these cases is in keeping with the choices made by many of our sister circuits. *See generally* Detre, *supra,* at 1919–20 ("While not explicitly endorsing any of the mathematical tests, the [*Duren*] Court seems to have considered only absolute disparity.... The majority of courts have looked to absolute disparity or ... [a similar] standard[ ] to determine whether underrepresentation of a group is substantial for purposes of the fair cross-section guarantee."). At least six circuits have endorsed the absolute disparity or closely related "absolute impact"[5] method of calculating underrepresentation (although some have also noted that even were comparative disparity used, the number presented would not be enough to demonstrate a problem with the jury selection process at issue). *See United States v. Shinault,* 147 F.3d 1266, 1272–73 (10th Cir.) (stating that "[i]n this circuit, absolute disparity ... is the starting place for all other modes of comparison," noting the flaws in both disparity approaches, and concluding that neither the absolute nor the comparative disparities calculated demonstrate a constitutional or statutory violation (internal quotation marks omitted)), *cert. denied,* —— U.S. ——, 119 S.Ct. 459, 142 L.Ed.2d 411 (1998); *United States v. Rioux,* 97 F.3d 648, 655–56 (2d Cir.1996) ("Although we have admittedly waffled on this issue in the past, the law in this Circuit strongly suggests the absolute disparity/absolute numbers approach is appropriate in this case."); *United States v. Ashley,* 54 F.3d 311, 313–14 (7th Cir.1995) (applying absolute disparity); *United States v. Sanchez–Lopez,* 879 F.2d 541, 547 (9th Cir.1989) ("[W]e have consistently favored an absolute disparity analysis and have rejected a comparative disparity analysis."), *quoted in Thomas v. Borg,* 159 F.3d 1147, 1150 (9th Cir.1998); *Ford v.*

---

5. This method, which is also sometimes called "absolute numbers," measures "the average difference in the number of jurors per venire due to the underrepresentation." *Rioux,* 97 F.3d at 655 ("[I]f the absolute disparity of Blacks is 8%, between four and five Blacks would have to be added to a jury pool of 60 persons to ensure adequate representation (8% of 60 = 4.8).").

*Seabold,* 841 F.2d 677, 683–84 (6th Cir. 1988) (conducting an absolute disparity analysis but relying on the third *Duren* prong to reject the fair cross-section claim); *United States v. Clifford,* 640 F.2d 150, 155–56 (8th Cir.1981) ("This court has not seen fit to adopt the comparative disparity concept as a better means of calculating underrepresentation."), *cited in United States v. Rogers,* 73 F.3d 774, 775–77 (8th Cir.1996) (acknowledging that the panel is bound by circuit precedent, but arguing that comparative disparity is superior for dealing with small distinctive groups).[6]

A few circuits have either not chosen between the two methodologies or have taken different approaches. *See United States v. Lewis,* 10 F.3d 1086, 1090 (4th Cir.1993) ("[I]n order to be fair and reasonable, the disparity between the proportion of eligible whites selected for [the] master jury wheel and [the] proportion of eligible minority persons selected must not exceed twenty percent." (internal quotation marks omitted)); *Ramseur,* 983 F.2d at 1231–35 (considering comparative disparity and absolute disparity, without favoring one over the other, in the course of resolving equal protection and Sixth Amendment challenges).

Many of the courts that have endorsed an absolute disparity or absolute impact test have also echoed the *Hafen* court's criticisms of the comparative disparity measure. *See, e.g., Thomas,* 159 F.3d at 1150 ("[T]he comparative disparity test is strongly disfavored in the Ninth Circuit on the ground that it exaggerates the effect of any deviation."); *United States v. Pepe,* 747 F.2d 632, 649 n. 18 (11th Cir.1984); *cf. Smith v. Yeager,* 465 F.2d 272, 279 n. 18 (3d Cir.1972) ("[T]he comparative approach reaches absurd results in [a case in which] ... the [black] population at the time was 4.4% of the total, and [black] jury participation ranged as low as 2% of the jury list").[7]

 Royal acknowledges that the absolute disparity standard is the "existing standard used in this Circuit," and does not make a serious attempt to distinguish *Hafen* and *Pion* from the case at hand, but urges this court to "change" the standard, noting that "[t]he absolute disparity standard ... can have the harsh effect of sanctioning the total exclusion of members of a minority group within the community when that group's percentage of the composition of the population is very low." Appellant's Brief at 21. However, "[i]t is axiomatic that, '[i]n a multipanel circuit, newly constituted panels are, for the most part, bound by prior panel decisions closely on point.' This principle applies in criminal as well as civil cases." *United States v. Graciani,* 61 F.3d 70, 75 (1st Cir.1995) (citation omitted) (quoting *Williams v. Ashland Eng'g Co.,* 45 F.3d 588, 592 (1st Cir.1995)).

 There are two exceptions to this stare decisis rule: (1) "[a]n existing panel

---

6. Further, the Fifth and Eleventh Circuits, which consider absolute disparities of up to 10% to be automatically acceptable, have suggested in the past that they might consider some measure other than absolute disparity in cases where the distinctive group at issue made up less than 10% of the population, but do not appear to have confronted such a case. *See United States v. Grisham,* 63 F.3d 1074, 1078–79 (11th Cir.1995); *United States v. Rodriguez,* 776 F.2d 1509, 1511 n. 4 (11th Cir.1985); *United States v. Butler,* 615 F.2d 685, 686 (5th Cir.1980) (per curiam) (denying petitions for rehearing and rehearing en banc); *United States v. Maskeny,* 609 F.2d 183, 190 (5th Cir.1980).

7. Some courts have also "reason[ed] that because comparative disparity measures an underrepresented group's chances of being called for jury service, it is not relevant to a Sixth Amendment challenge. In other words, the focus of the Sixth Amendment is the effect of the jury selection system on a defendant's right to a jury selected at random from a fair cross-section of the community." *United States v. Rioux,* 930 F.Supp. 1558, 1570 (D.Conn.1995) (citing *United States v. Jenkins,* 496 F.2d 57, 64–66 (2d Cir.1974)), *aff'd,* 97 F.3d 648 (2d Cir.1996); *see also United States v. Jackman,* 46 F.3d 1240, 1254 (2d Cir.1995) (Walker, J., dissenting). We do not enter this argument.

decision may be undermined by controlling authority, subsequently announced, such as an opinion of the Supreme Court, an en banc opinion of the circuit court, or a statutory overruling"; and (2) "authority that postdates the original decision, although not directly controlling, [may] nevertheless offer[ ] a sound reason for believing that the former panel, in light of fresh developments, would change its collective mind." *Williams*, 45 F.3d at 592; *see also Irving v. United States*, 162 F.3d 154, 160 (1st Cir.1998) (en banc). Royal does not expressly invoke either of these exceptions, and, in any event, neither of them is applicable. To the extent that the absolute disparity mode of analysis is open to criticism on statistical or logical grounds, *see, e.g., United States v. Jackman*, 46 F.3d 1240, 1247 (2d Cir.1995) (noting that absolute disparity ignores the size of the allegedly underrepresented group); *United States v. Levasseur*, 704 F.Supp. 1158, 1163 & n. 7 (D.Mass.1989) (same), this criticism is not by any means a "fresh development." Indeed, the *Hafen* court directly acknowledged that complete exclusion of a small distinctive group will result

in only a small absolute disparity, and nevertheless chose to apply the absolute disparity test to the case before it. *See Hafen*, 726 F.2d at 23–24.[8]

We accordingly employ the absolute disparity test to assess Royal's fair cross-section claim under the second prong of the test under the Sixth Amendment and the Act.[9] Royal argues that "[although Blacks constitute 4.86% of the 1990 United States Census count for the total population of all persons 18 years and over in the ... Eastern Division, they comprise only 1.89% of the prospective jurors on the [1994] Master Jury Wheel, ... only 2.2% of all prospective jurors" who were not deemed exempt, disqualified, or excused, and "only 2.9% of the jurors who appeared for jury orientation." Appellant's Brief at 35. Of these percentages, the 1.89% figure yields the highest absolute disparity: 2.97% (4.86%, Royal's baseline population figure, minus 1.89%).[10] Even assuming *arguendo* that Royal's numbers and calculations are all correct and that he has provided the appropriate numbers to plug into an absolute disparity calculation,[11] we conclude that the absolute disparity of 2.97%

---

8. We note, however, that *Hafen* did not confront a situation involving complete exclusion, and neither do we.

9. We also reject Royal's argument, made in reliance on *United States v. Biaggi*, 909 F.2d 662 (2d Cir.1990), that the comparative disparity methodology should be used because the Jury Clerk's excuse of ten jurors without recording a reason is a "circumstance less benign than use of voter registration lists." *Id.* at 678. First, *Biaggi* is not binding on this court. Second, as discussed below, the excusing of these jurors was no more than a technical violation of the Act, and does not constitute some sort of malignant circumstance. Finally, since Royal has chosen to rely on statistics related to the master jury wheel in order to calculate disparity, it is hard to see how the excusing of these jurors—which took place at a later stage in the selection process than the formation of the master wheel—is relevant to the choice of disparity analysis.

10. Using his calculation of the percentage of blacks on the 1994 master jury wheel, Royal calculates a comparative disparity of 60.9%.

11. Understandably, there do appear to be some flaws in these figures. For instance, Royal's use of the number of self-identified blacks who returned qualification forms to calculate the percentage of blacks on the master jury wheel (1.89% of 21900 = 415), a wheel that includes everyone who was mailed such a form,, assumes that none of the nondeliverable and nonreturned qualification forms were addressed to black recipients (despite Royal's conclusion that the district court's mailings failed more frequently in areas with large black populations) and that none of the individuals who declined to designate their race was black. *See Royal*, 7 F.Supp.2d at 105. Also, Royal states that 18,451 of the 21,900 potential jurors summoned returned juror qualification forms, and that 16,193 of those returning forms were white, 415 were black, 319 were Asian, 165 were Hispanic, and 1,185 declined to designate their race— but the numbers in these five categories do not add up to 18,451, and Royal does not explain what happened to the other 174 potential jurors.

is, given the circumstances of this case, not meaningfully distinguishable from the 2.02% absolute disparity accepted in *Hafen*. It is therefore insufficient to satisfy Royal's burden under the second prong of *Duren*. See *Hafen*, 726 F.2d at 23–24; *cf.*, *e.g.*, *Shinault*, 147 F.3d at 1272–73 (accepting an absolute disparity of 2.56% and comparative disparity of 50.09% for blacks, who were 5.11% of the voting age population); *United States v. Suttiswad*, 696 F.2d 645, 648–49 (9th Cir.1982) (accepting an absolute disparity of 2.8% for blacks, who were 9.3% of the population; an absolute disparity of 7.7% for "Spanish" persons, who were 11.9% of the population; and an absolute disparity of 4.7% for Asians, who were 8.3% of the population). Because we decide this case under *Duren*'s second prong—fair and reasonable representation—we do not reach the issue of systematic exclusion under *Duren*'s third prong. See *Hafen*, 726 F.2d at 24.

 Royal argues that the Massachusetts resident lists do not include an adequate number of blacks, that the selection process fails to provide for follow up on nondeliverable and nonreturned qualification forms even though a disproportionate number of such forms are traceable to areas with significant black populations, and that ten black prospective jurors were excused without a reason recorded. Although such arguments have been briefed under the "systematic exclusion" rubric, an appellation that adds nothing to those arguments given our holding, we nevertheless briefly consider whether Royal has identified a "substantial failure to comply with" any provision of the Act besides the fair cross-section requirement. 28 U.S.C. § 1867(a).[12] "A substantial failure is one that contravenes one of . . . two basic principles . . . :(1) random selection of jurors, and (2) determination of juror disqualification, excuses, exemptions, and exclusions on the basis of objective criteria. Technical violations, or even a number of them, that do not frustrate the[se] . . . requirements and do not result in discrimination and arbitrariness do not constitute a substantial failure to comply." *United States v. Savides*, 787 F.2d 751, 754 (1st Cir. 1986); see also *United States v. Ramirez*, 884 F.2d 1524, 1530 (1st Cir.1989) ("The test . . . for a substantial violation is whether it 'either allowed discriminatory selection of jurors or otherwise prevented jury panels from consisting of fair cross sections of the community.'" (quoting *United States v. Bearden*, 659 F.2d 590, 602 (5th Cir. Unit B Oct.1981))); H.R.Rep. No. 90–1076 (1968), *reprinted in* 1968 U.S.C.C.A.N. 1792, 1793–94.

 The use of the resident lists cannot be such a substantial failure to comply with the Act; Congress specifically endorsed the use of resident lists for Massachusetts. See 28 U.S.C. § 1863(b)(2) ("The plan for the district of Massachusetts may require the names of prospective jurors to be selected from the resident list provided for in chapter 234A, Massachusetts General Laws, or comparable authority, rather than from voter lists."). The failure to follow up on the qualification forms, enclosed with summonses, that are not completed and returned does not constitute a substantial violation of the Act in this case, where no fair cross-section violation has been established. See 28 U.S.C. §§ 1864, 1866; *United States v. Gometz*, 730 F.2d 475, 479–82 (7th Cir.1984) (en banc); *United States v. Santos*, 588 F.2d 1300, 1303 (9th Cir.1979).

 More troubling is the excusing of ten black prospective jurors without a recorded reason. However, there is nothing to suggest that subjective criteria were used to excuse these jurors (for instance,

---

12. Royal couches some of his arguments in abuse of discretion language, claiming that the Jury Clerk abused her discretion in taking certain actions and in failing to take others. We construe his argument to be that the Clerk substantially failed to comply with the Act, since violations of the Plan do not aid Royal's quest for a new trial unless they are also violations of the Act that meet this test.

Royal has provided no data on the number of nonblack jurors who were excused without a recorded reason [13]), *see* 28 U.S.C. § 1862 ("No citizen shall be excluded from service as a grand or petit juror in the district courts of the United States . . . on account of race, color, religion, sex, national origin, or economic status."), and the "opportunity to err" that exists here is not enough to establish a substantial failure to comply with the Act. *Savides*, 787 F.2d at 754–55 (excusing the court's error in using "a commercial mailing firm to select the names of potential jurors" and stating that "a mere opportunity to err or discriminate in the jury selection process [does not] constitute[ ] a substantial failure to comply with the policy and purposes of the Act"); *cf. United States v. Gregory*, 730 F.2d 692, 700 (11th Cir.1984); *United States v. Bearden*, 659 F.2d 590, 607–08 (5th Cir. Unit B Oct.1981); *United States v. Pleier*, 849 F.Supp. 1321, 1333 (D.Alaska 1994) (noting that some recording errors involving the marking of jurors as "absent" may have occurred, but concluding that these errors "reflect[ ] only some of the unavoidable 'play' in the jury selection system" (quoting *Hamling v. United States*, 418 U.S. 87, 138, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974))). *But see United States v. Calabrese*, 942 F.2d 218, 229 (3d Cir.1991). Although the number of prospective black jurors was admittedly small, the recording errors were nevertheless "too few in number, too insignificant, too desultory, to constitute a substantial violation of the Act." *United States v. Marrapese*, 610 F.Supp. 991, 1001 (D.R.I.1985); *see also United States v. Candelaria–Silva*, 166 F.3d 19, 33 (1st Cir. 1999). This is so even though excusing these ten jurors was apparently done by the clerk rather than by a district court judge. *See* 28 U.S.C. § 1866(c); *Ramirez*, 884 F.2d at 1530 & n. 6.

### III

Royal has argued that he is entitled to a new trial because his jury was selected through a process that did not produce a fair cross-section as is guaranteed by the Sixth Amendment and the Act. We have found that he is not entitled to a new trial because he established no such violation. There is a difference between what violates the law and what, while not in violation, is still a situation leaving much to be desired. The statistics presented—that in 1994 fewer than 200 persons who identified themselves as black actually presented for jury duty, out of more than 5000 prospective jurors appearing in the Eastern Division—are disquieting.

The District of Massachusetts may wish to consider whether taking additional steps that are responsive to the issues that Royal has identified,[14] such as sending follow-up postcards to prospective jurors who do not return their qualification forms, would serve the goals of "assurance of a diffused impartiality," encouragement of "public confidence in the fairness of the criminal justice system," and "civil responsibility." *Taylor*, 419 U.S. at 530–31 (internal quotation marks omitted); *see also Anaya v. Hansen*, 781 F.2d 1, 7 (1st Cir.1986) ("[T]here is a difference between the optimal results which particularly well-administered jury plans . . . can achieve, and the minimum which the Constitution requires."); *United States v. Reyes*, 934 F.Supp. 553, 566 (S.D.N.Y.1996) ("[A] finding that the above disparities are not unconstitutional is not the same as an endorsement of such discrepancies."). We also note that careful recordkeeping, in-

---

**13.** In response to this point, Royal states in his brief that he "should not be asked to quantify the unknowable." Appellant's Brief at 37. However, it is not clear why Royal could not have gathered this data when inspecting the 1994 jury selection materials.

**14.** Royal's appointed counsel are to be commended for their efforts in this case, as is the Office of the United States Attorney for the District of Massachusetts, which indicated at oral argument its willingness to work on steps to increase the number of persons of color in the venire.

cluding recording the reasons for disqualifications, exemptions, and excusals, "constitutes an important means for checking on the operation of the selection system." H.R. Rep. 90–1076, *reprinted in* 1968 U.S.C.C.A.N. 1792; *see also* 28 U.S.C. §§ 1865, 1866(d).

Nevertheless, we have carefully considered all of Royal's arguments, and find no constitutional or statutory infirmity that would warrant a new trial. The district court's denial of Royal's motion for a new trial is therefore *affirmed.*