823 So.2d 411 (2002)
STATE of Louisiana,
v.
Patrick KENNEDY.
No. 02-K-214.
Court of Appeal of Louisiana, Fifth Circuit.
June 26, 2002.
*412 Paul D. Connick, Jr., District Attorney, Terry M. Boudreaux, Thomas J. Butler, Gregory Kennedy, Donald A. Rowan, Jr., Assistant District Attorneys, 24th Judicial District, Parish of Jefferson Gretna, LA, for Respondent.
Mark Armato, Metairie, LA, and Clive A. Stafford Smith, New Orleans, LA, for Relator.
Panel composed of Judges SOL GOTHARD, JAMES L. CANNELLA, and THOMAS F. DALEY.
*413 THOMAS F. DALEY, Judge.
Patrick Kennedy, defendant/relator, seeks this court's supervisory review of the trial court's denial of his Motion to Quash Indictment. The trial court found that while Kennedy made out a prima facie case of purposeful discrimination against women in the selection of grand jury forepersons over a 10 year period in Jefferson Parish, the State rebutted the case by showing racial and gender neutral selection criteria. We granted this writ application to review this important issue. After considering defendant's arguments, the State's opposition, the transcript of the hearing, and the introduced statistical and expert testimony, we affirm the trial court's denial of the Motion to Quash, but on different grounds. We find that under current applicable law, the defendant did not show a prima facie case of purposeful discrimination against women in the grand jury foreperson selection process.
Relator, an African-American male, was indicted on May 7, 1998 for capital aggravated rape of a female under the age of 12 allegedly occurring on March 2, 1998, in violation of LSA-R.S. 14:42. Defendant filed a Motion to Quash the indictment on the basis of race and gender discrimination in violation of defendant's rights to due process, equal protection, and the right to be indicted by a grand jury that represented a fair cross section of society. He specifically asserted that the foreperson of the grand jury that indicted him was a white male; the procedure for selecting grand jury forepersons was susceptible to abuse; there was intentional, discriminatory, and systematic exclusion of African-Americans from the position of foreperson on the grand jury that indicted defendant; the parish has a history and pattern of intentional, discriminatory, and systematic exclusion of African-Americans from the position of grand jury foreperson; the trial judges chose to appoint a white male as foreperson; and, there is both race and gender discrimination in the selection of the grand jury foreperson. Defendant claimed that Louisiana's selection process for grand jury foreperson violated defendant's constitutional rights to due process, equal protection, and the right to be indicted by a grand jury made up of a fair cross-section of the community.
A hearing was held on January 14, 2002. At the hearing, the relevant time period to be examined was set by the court as the roughly 10-year period preceding the defendant's indictment, starting May 24, 1988 and ending September 10, 1998, the year in which the defendant was indicted.[1] The defendant presented data (Tables D-1, 2 and 3, not included in defendant's Writ Application, but supplied by the State in its Opposition thereto) representing the race and gender of each grand jury foreperson selected during that time period (and a greater 19 year time period, from 1979 until 1988) and the race and gender of the judge who selected the grand jury foreperson. The State stipulated to the authenticity of the data, though not to the interpretation of that data by the defendant's expert, Dr. Joel Devine. At closing argument, the defense stated that the composition of the grand jury itself was not at issue, because it was randomly selected. Defense counsel also conceded that the evidence did not show discrimination *414 against African-Americans as grand jury forepersons during the 10-year time period, but did show discrimination against women as grand jury forepersons.
During the 10-year time period considered by the trial court, there were 19 grand juries empaneled and 19 grand jury forepersons selected by the judges of the 24th Judicial District Court of Jefferson Parish. Ten forepersons were white males; six were white females; one was a black female; and two were black males. Thus, African-Americans made up 15.78% of the grand jury forepersons during this time period; and women were grand jury forepersons 36.8% of the time.
This data was compared to several statistical population samples, the 1990 and 2000 census figures from Jefferson Parish, average voter registration from Jefferson Parish for 1990-2000, and the number of women called randomly to serve on grand juries during the above-mentioned 10-year period.[2] For African-Americans, the 1990 census data shows that 17.63% of the population of Jefferson Parish were African-Americans. Thus, comparing the population percentage of African-Americans to the percentage of African-Americans chosen as grand jury forepersons, there is an absolute disparity of 1.85% (17.63% minus 15.78%). Considering the 2000 census data, 22.9% were African-American. Thus, the disparity in 2000 becomes 7.12% (22.9% minus 15.78%). Considering voter registration lists, 15% were African-American. Thus, the disparity is0.78%, indicating that a slightly higher portion of African-Americans were chosen to serve as forepersons in comparison to the voting population of Jefferson Parish.
Regarding women, it is noted that 36.8% of the forepersons were women for the 10-year period. The 1990 census figures show 51.95% females in the gross population, indicating an absolute disparity of 15.15%. The 2000 census figures show 52% as female. For 2000, the disparity is 15.2%. Considering the voter registration for 1990 to 2000, females represent 54.21%, an absolute disparity of 17.41%. The number of women randomly called to serve on grand juries from May 1988 until September 1998 was 50.2%, for an absolute disparity of 13.4%. Therefore, for women, the disparities range from 13.4% to 17.41%. We note that women comprised a much larger segment of the overall population segments than did African-Americans.
Dr. Devine was qualified as an expert in quantitative sociology. He did some calculations using the binomial distribution method to determine the probability of the composition of the forepersons over the grand juries in the period covered by the data. At the conclusion of Dr. Devine's testimony the court found that the defendant had shown a prima facie case of discrimination. The court gave no reasons for its ruling.
Following that ruling, the State offered the testimony of Judge Marion Edwards in rebuttal. Judge Edwards, a former Assistant District Attorney, testified that he served over 25 years in that position before being elected to the 24th JDC in 1996. As Assistant District Attorney, he had been involved in the grand jury foreperson *415 selection process for about 19 years.[3] His role in this process consisted of soliciting volunteers for the foreperson position. He made positive efforts to interest and include minorities and women in this position, though he noted that more white males volunteered than any other group. Ultimately, however, the selection of foreperson was up to the particular judge, who interviewed each volunteer. Edwards had no involvement in these interviews. His involvement was limited to compiling a group of volunteers for foreperson to be interviewed by the judge.[4] He testified that the judges who selected the grand jury foreperson looked for a someone who was qualified to serve on the grand jury, was literate, had organizational skills, and was interested in and was capable of serving as foreperson. After the conclusion of the State's evidence offered in rebuttal, the court found that:
... The Court is persuaded after hearing all of the evidence, that the State of Louisiana has shown that there, to the extent of the statistics in the methodology for selecting Grand Jury Forepersons, that these criteria are permissible, racially and gender neutral."

ANALYSIS
Recently, the Louisiana Supreme Court addressed the applicable law to be applied when reviewing an equal protection challenge to grand jury selections in State v. Langley, supra, 95-1485 (La.4/3/02), 813 So.2d 356, 2002 La. Lexis 965 (Langley III):
... the Supreme Court [U.S.] set out a three-part test in Castaneda v. Partida, supra. To demonstrate an equal protection violation in the context of grand jury selection, a defendant must establish a prima facie case of purposeful discrimination by showing: (1) that those discriminated against belong to a recognizable, distinct class, singled out for different treatment under the laws, as written or as applied; (2) that the degree of under-representation must be proved "by comparing the proportion of the group in the total population to the proportion called to serve as grand jurors, over a significant period of time;" and (3) that the selection procedure is "susceptible of abuse or is not racially neutral" so as to support the presumption of discrimination raised by the statistical showing. Castaneda v. Partida, 430 U.S. at 494-95, 97 S.Ct. at 1280, [51 L.Ed.2d 498]; see also State v. Cosey, 97-2020, p. 10, 779 So.2d at 682. This court has previously acknowledged that blacks and women are identifiable groups capable of being singled out for disparate treatment. State v. Cosey, 97-2020, p. 10, 779 So.2d at 682, citing J.E.B. v. Alabama ex. rel. T.B., 511 U.S. 127, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994). This court has also recognized that, at the time the defendant was indicted, Louisiana's procedure for selecting grand jury forepersons was unquestionably *416 subject to abuse according to subjective criteria that may include race and gender. Cosey, 97-2020, pp. 10-11, 779 So.2d at 682-83, citing Campbell v. Louisiana, supra; Johnson v. Puckett, supra.
The remedy for intentional discrimination in the selection and composition of grand juries, whether resulting in the complete exclusion of an identifiable group or substantial under representation of that group, is to vacate the conviction and quash the indictment returned by the unconstitutionally constituted grand jury.[5]
Defendant herein was indicted prior to the 1999 amendment allowing for random selection of the foreperson, a time when Louisiana's procedure for selecting grand jury forepersons was subject to abuse according to subjective criteria that may include race and sex.[6] Women are an identifiable group who are capable of being singled out for disparate treatment.[7] Therefore, defendant has met two of the three criteria for making a prima facie case of discrimination in the selection of the foreperson.
The State argues in its opposition that defendant failed to meet its burden of proving a prima facie case. We note that the court gave no basis or reasons for its finding; thus, we have no way of determining what criteria the court used or what evidence it found significant. Without oral or written reasons, the court of appeal is without the benefit of the trial court's thought processes. We must review the trial court's result, the denial of the Motion to Quash, in light of the evidence presented to determine if the result was correct.
The determination of under representation is necessarily dependent upon a determination of what constitutes the relevant time period and a determination of the relevant comparative population. The State relies on pre-Langley III cases showing a range of 10 years to 12 years.[8] In Langley III the relevant time period examined was identified as a 22-year period.
In Langley III the absolute disparity from the percentage of grand jury members to the percentage of African-American forepersons ranged from 15.5% to 15.9%. With respect to women, the absolute disparity was 25.4%. The court found there was no manifest error in the trial court's conclusion that defendant established a prima facie case of purposeful discrimination under Castaneda.[9]
In the present case, the absolute disparity for African-Americans selected as forepersons for the 10-year period ranges from 7.12% to0.78%, a figure that is far below the 15.5% to 15.9% absolute disparity in Langley III. The figure is also far below the absolute disparities noted by the Langley III court in other cases that ranged from 14.7% to 40.1%.[10] Regarding women serving as forepersons, the absolute disparity for the 10-year period ranges from 13.4% to 17.21%, absolute figures that fall partially within the Langley III range as significant.
*417 Intentional discrimination is an element of an equal protection challenge to the selection of grand juries.[11] Our analysis requires not only the consideration of significant absolute disparities but also other criteria such as the number of years involved, the size of the sampling, and the number of the class in the general population, in order to obtain the most accurate and complete picture of the disparity in the context of the totality of the circumstances. Bryant v. Wainwright[12] held that a disparity of 10.4% did not support a prima facie showing.[13] The court reviewed various ranges as follows:
Most courts, however, have adopted a single method for evaluating a defendant's statistical evidence. A determination is made first of the percentage of the relevant general population composed of the particular group or class allegedly singled out for discriminatory treatment. A similar finding must then be made of the percentage of the same group or class represented in grand jury venires or the office of grand jury foreperson. Finally, the two figures are compared, and if the result reveals a significantly large disparity, then there arises a presumption of discrimination. For example, in Turner v. Fouche, 396 U.S. 346, 90 S.Ct. 532, 24 L.Ed.2d 567 (1970), the evidence established that in 1968 sixty percent of Taliaferro County, Georgia, was black, although the same class represented only thirty-seven percent of the grand jury. The Court had no difficulty in concluding that a disparity of twenty-three percentage points in any given year was too large to be explained by any reason other than discrimination. Turner v. Fouche, 396 U.S. at 359, 90 S.Ct. at 539. Likewise, in Whitus v. Georgia, 385 U.S. 545, 87 S.Ct. 643, 17 L.Ed.2d 599 (1967), there was a significant disparity of over thirty points in the percentage of blacks in the general population of Mitchell County, Georgia, and the percentage of blacks on the county's grand and petit jury venires. In contrast, in Swain v. Alabama, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965), a difference of only ten percentage points was not sufficient to establish a prima facie case of discrimination. These cases serve only as general guidelines, since, as we noted earlier, there is no magic number which can control a court's resolution. We cannot hold that any disparity over fifteen percentage points is always too great, and any disparity under twelve percentage points is always permissible. In cases where the statistical difference is arguably substantial, a court must look beyond the figures to other criteria such as the number of years involved, the size of the sampling, and the number of the class in the general population. A disparity of fifteen percentage points is much greater in a case where the class or group represents only twenty percent of the general population, than where the class or group represents seventy percent of the population. Similarly, a disparity of fifteen percentage points is much more significant if it has continued for ten years, than if it has occurred in only one isolated year. The magnitude of a disparity may also depend on whether the statistics are based on one grand jury venire of thirty people, or on *418 dozens of grand jury venires representing thousands of people. See Rose v. Mitchell, [443 U.S. 545, 571[,] 99 S.Ct. 2993, 3007, 61 L.Ed.2d 739 (1979)].[14]
Thus, the significant disparities noted in Bryant range from 23% to 30%. See also Ramseur v. Beyer[15] (14.1% is of borderline significance); United States v. Hawkins[16] (1.75% to 5.45% not significant).
Langley III noted the following significant range from 14.7% to 40.1%:
Compare Castaneda v. Partida, 430 U.S. at 495-96, 97 S.Ct. at 1280-1281 ... (absolute disparity of 40.1%); Turner v. Fouche, supra (absolute disparity of 23%); Whitus v. Georgia, 385 U.S. 545, 87 S.Ct. 643, 17 L.Ed.2d 599 (1967) (absolute disparity of 18%); Jones v. Georgia, 389 U.S. 24, 88 S.Ct. 4, 19 L.Ed.2d 25 (1967) (absolute disparity of 14.7%).[17]
We note that in Whitus, the total African-American population segment was 27.1%, with only 9.1% represented in the venire, and in Jones, it was 19.7%, with only 5% on the jury list. These cases can be distinguished from the facts in the instant case because these absolute disparities were drawn from much smaller overall comparative population segments than the 51.95% to 54.21% statistical bases for women in Jefferson Parish.
The analysis of the figures looking at "comparative" disparities, together with absolute disparities, has been cited with approved for analyzing large, as opposed to small, segments of the population for under representation.[18] Comparative disparity is calculated by dividing the absolute disparity by the population figure for a population group. It measures the diminished likelihood that members of an under represented group, when compared to the population as a whole, will be called for jury service. Ramseur at 1231. Because we think that figures from both methods inform the degree of under representation, we will examine and consider the results of both in order to obtain the most accurate picture possible.[19] See also Ramseur v. Beyer, supra, which used both absolute and comparative disparity methods when considering an equal protection challenge regarding the empaneling of grand juries.
Regarding women, it is noted that 36.8% of the forepersons were women for the 10 year period. The 1990 census figures show 51.95% women, for an absolute disparity of 15.15%, and a comparative disparity of 29.16%. The 2000 census figures show 52% female, for an absolute disparity of 15.2%, and a comparative disparity of 29.23%. Considering the voter registration from 1990 to 2000, females represent *419 54.21%, an absolute disparity of 17.41% and a comparative disparity of 32.12%. Considering the number of women called randomly to serve in grand juries from 1998 until 1998, 50.2%, the absolute disparity is 13.4% and the comparative disparity is 26.7%.
The comparative disparity figures show that females served as grand jury forepersons 68-70% of the time in relation to their overall representation in the population groups, or conversely, that they were under represented 29-32% of the time. Ramseur considered a comparative disparity, or under representation, of 40% as "borderline." We note that the comparative disparities in Langley III were almost 70% for African-Americans (absolute disparity of 15.9% divided by 22.9%, the population base for African-Americans) and 48.5% for women (25.4% absolute disparity divided by 52.4% population base).[20]
Consistently, throughout the cases in this area, the courts have exhibited a reluctance to emphasize any one factor that controls the court's resolution of the issue. There is no magic, controlling number. Rather, we have been instructed to look at all the factors that bear on the issue, such as the number of years involved, the duration of the disparity, the size of the population segment, and the number of grand juries considered. In other words, it is the totality of the circumstances that must be considered in determining whether the defendant has succeeded in making a prima facie showing of significant under representation.
In this case, considering all these factors, we find that the defendant has failed to meet his burden. There was no discrimination shown in the selection of African-American grand jury forepersons. To the contrary, there was a showing that the percentage of African-Americans selected as grand jury forepersons, as it related to African-Americans registered to vote, was slightly higher rather than lower over the 10 year period preceding the selection of the grand jury that indicted the defendant in this case. While the defendant makes the point that the absolute disparity was greater when the preceding 19 years are considered rather than just the preceding 10 years, the fact that the disparity did not continue, made obvious by the significant improvement in the system evidenced by the more recent numbers, provides ample justification for placing more emphasis on the preceding 10 years rather going back 19 years.
Similarly, as concerns the statistical disparity between the female population in the parish and the number of female forepersons chosen for grand jury duty, we find a system that has significantly improved over time. Thus, considering the 10 years preceding the selection of the defendant's grand jury, we find that of the total number of female grand jurors randomly called to serve[21], 50.2% were female, and of that number, women were chosen as grand jury forepersons 36.8 % of the time, leaving an absolute disparity of 13.4%. These figures come from a total of only 19 grand juries selected over this 10 year period.
In Langley III, the Court found an unrebutted prima facie showing of purposeful discrimination in the selection of grand jury forepersons where females were under represented by an absolute disparity of 25.4% and African-Americans by a 15.5%15.9%. In our case, African-Americans *420 were slightly over represented and females were under represented by 13.4% compared to the number of female grand jurors randomly selected. When the degree of the under representation of women is considered along with all the other factors such as the improvement in the selection process in the preceding 10 years rather than 19 years, the large size of the population segment and correlative small comparative disparity, and the fact that only 19 grand juries are considered, we cannot conclude that the defendant made a prima facie showing of purposeful discrimination in the selection of grand jury forepersons.
Accordingly, we affirm the trial court's ruling, finding that the trial court did not err in denying defendant's Motion to Quash the indictment.
WRIT OF REVIEW GRANTED; RELIEF DENIED.
NOTES
[1] At the hearing, the trial court alluded to a previous hearing, the date of which is not mentioned, wherein he requested data from this 10 year period to review. The defendant-relator presented data from this time period, which was analyzed by his expert witness. Additional data totaling 19 previous years, starting with figures from 1979, was also presented and analyzed, though the trial court only considered the 10 year period as the relevant time period.
[2] The use of gross population (census) figures and voter registration figures has been approved by the Louisiana Supreme Court as an appropriate basis for comparison with actual grand jury foreperson statistics. State v. Langley, 95-1489 (La.4/3/02), 813 So.2d 356, 2002 La. Lexis 965 (Langley III).

Defendant has conceded that the grand jury selection process was random and not discriminatory.
According to exhibit D-3, voter registration data for race were not available for 1988 and 1989. Data were not available for 1988 regarding gender.
[3] He was not involved with the grand jury that indicted the defendant, because he had already been elected to the bench at that time. And as a district court judge, he never selected a grand jury foreperson.
[4] We note that under prevailing jurisprudence, Judge Edwards's testimony, as a matter of law, was insufficient to rebut a prima facie case if made by defendant. Jurisprudence has shown that the State should present the testimony of the actual person(s) who made the selection of the grand jury foreperson. Because Judge Edwards did not make the actual selection of foreperson, he was not a competent witness to testify regarding what criteria the selecting person used in picking the foreperson. See Castaneda v. Partida, 430 U.S. at 491, 97 S.Ct. 1272, 51 L.Ed.2d 498; Guice v. Fortenberry, 722 F.2d 276 (5th Cir.1984); United States v. Perez-Hernandez, 672 F.2d 1380 (11th Cir.1982).
[5] Langley III, 2002 La. Lexis 965, pp. 39-40.
[6] Langley III, supra.
[7] State v. Cosey, 779 So.2d at 682-683.
[8] State v. Young, 569 So.2d 570 (La.App. 1 Cir.1990)(using a 10 year period); State v. Thomas, 609 So.2d 1078, 1081 (La.App. 2 Cir.1992)(holding a 12 year period "sufficiently reasonable and significant"); State v. Davis, 626 So.2d 800, 804 (La.App. 2 Cir. 1993)(12 year period significant); State v. Guillory, 97-179, p. 21 (La.App. 3 Cir. 3/11/98), 715 So.2d 400, 413 (10 year period).
[9] Langley III, 2002 La. Lexis 965, pp. 42-43.
[10] Langley III, 2002 La. Lexis 965, pp. 42-43.
[11] U.S. v. Royal, 174 F.3d 1 (1st Cir. 1999), citing Duren v. Missouri, 439 U.S. 357, 369, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979).
[12] 686 F.2d 1373, 1375-1376 (11th Cir.1982), reh'g denied, 691 F.2d 512 (11th Cir.Fla. 1982), cert. denied, 461 U.S. 932, 103 S.Ct. 2096, 77 L.Ed.2d 305 (1983)
[13] 686 F.2d at 1377.
[14] 686 F.2d at 1377 (footnote omitted)(emphasis added).
[15] 983 F.2d 1215, 1232 (3rd Cir. 1992), cert denied, 508 U.S. 947, 113 S.Ct. 2433, 124 L.Ed.2d 653 (1993).
[16] 661 F.2d 436, 442 (5th Cir.1981), cert. denied, 456 U.S. 991, 102 S.Ct. 2274, 73 L.Ed.2d 1287 (1982).
[17] 2002 La. Lexis 965, pp. 42-43.
[18] U.S. v. Weaver, 267 F.3d 231 (3rd Cir.9/21/01). We have found no Louisiana State court case that discusses the use of comparative disparity analysis as a complement to the use of absolute disparity analysis. Weaver considered a fair cross section claim, which differs from an equal protection claim.
[19] We note that some federal circuits have criticized the use of comparative disparity analysis, especially when considering small segments of the population, because then it tends to exaggerate the effect of any deviation. Some circuits have also criticized the use of absolute disparity analysis, while others use both methods in complement with one another. U.S. v. Royal, 174 F.3d 1 (1st Cir. 1999), and cases cited therein.
[20] Langley III, 2002 La. Lexis 965, p. 42.
[21] We note that the defendant has conceded that the grand jury selection process was random and not discriminatory.