846 So.2d 114 (2003)
STATE of Louisiana
v.
Erran FLEMING and Kevin Trainor.
No. 2002-KA-1700.
Court of Appeal of Louisiana, Fourth Circuit.
April 16, 2003.
*117 Harry F. Connick, District Attorney of Orleans Parish, Roger W. Jordan, Jr., Assistant District Attorney of Orleans Parish, C. Adriana White, Assistant District Attorney of Orleans Parish, New Orleans, LA, for Plaintiff/Appellant.
Arcenious F. Armond, Jr., Gretna, LA, and Richard C. Teissier, Carol Kolinchak, Orleans Capital Conflict Panel, New Orleans, LA, and Clive A. Stafford Smith, Louisiana Crisis Assistance Center, New Orleans, LA, for Defendants/Appellants.
(Court composed of Judge JOAN BERNARD ARMSTRONG, Judge PATRICIA RIVET MURRAY, Judge DENNIS R. BAGNERIS, Sr.).
PATRICIA RIVET MURRAY, Judge.
In this joint first degree murder case, the State appeals the trial court's ruling quashing Defendants' indictments based on racial and gender discrimination in the selection of the grand jury foreperson in Orleans Parish from 1987 to 2000. We reverse.

STATEMENT OF THE CASE
On September 3, 1998, an Orleans Parish grand jury indicted Erran Fleming and Kevin Trainor for the July 7, 1998 murder of Kevin Wooldridge at his French Quarter residence during the course of an armed robbery. On July 11, 2001, the trial court granted Defendants' motion to quash their indictments, finding: (1) Defendants presented a prima facie case of discrimination in the selection of grand jury forepersons in violation of the due process and equal protection clauses of the Fourteenth Amendment of the United States Constitution, and (2) former La.C.Cr.P. art. 413(C) was an unconstitutional local or special law in violation of La. Const. art. III, § 12. The State filed a direct appeal to the Louisiana Supreme Court pursuant to La. art. V, § 5(D)(1). Finding the trial court's decision quashing the indictments was not properly before it, the Supreme Court reasoned: "having found that former La. C.Cr.P. art. 413(C) was unconstitutionally applied in violation of the Fourteenth Amendment and quashing the indictments on that basis, the trial judge should have refrained from also determining that La. C.Cr.P. art. 413(C) was unconstitutional under La. Const. Art. III § 12(a)(3) as a local or special law." State v. Fleming, 2001-2799, p. 5 (La.6/21/02), 820 So.2d 467, 470. The Supreme Court thus transferred the matter to this court to be treated as an appeal by the parties. These appeals followed.
On appeal, the State assigns the following three errors:
1. The trial court erred in quashing the indictment against the defendants because these defendants did not suffer any constitutional injury: the body of individuals comprising the grand jury that indicted them constituted a fair representation of the Orleans Parish community; no evidence of substantial under-representation of a recognizable class or race was presented to the trial court; and the trial court did not doubt that the selecting judge exercised his discretion in good faith and without abuse.
2. The trial court erred in quashing the indictment against these defendants based on equal protection and due *118 process violations by finding that the defendants established a prima facie case of discrimination in the selection of Orleans Parish grand jury forepersons from 1987 to 2000, when the only data presented to the court was incomplete and the relevant data does not show substantial under-representation of a recognizable class or race.
3. The trial court erred in quashing the indictment against these defendants based on due process grounds concerning the selection of Orleans Parish grand jury forepersons when the foreperson is selected from the ranks of already seated grand jurors, and the role of the foreperson in Louisiana is largely ministerial in nature.
The defendant, Mr. Trainor, assigns the following two errors:
1. The state waived its right to appeal the decision of the trial court by failing to call a single witness or present any evidence of a neutral non-discriminatory reason for the evidence presented.
2. The trial court committed reversible error in limiting its decision to the period 1987 through 2000.

DISCUSSION
At the outset, we dispose of Mr. Trainor's two arguments. First, we find no error in the trial court limiting its decision to 1987 to 2000 given Defendants' statistical evidence was limited to that thirteen-year period. Second, the State's failure to present rebuttal evidence in the trial court does not preclude it from appealing the trial court's decision quashing the indictments; La. C.Cr.P. art. 912 expressly authorizes the State to appeal a judgment quashing an indictment.
The State's three arguments can be synopsized as alleging "errors in the trial court's finding that the defendants demonstrated a prima facie case of discrimination in the selection of grand jury forepersons between 1987 and 2000, in violation of the equal protection clause, and due process clause of the Fourteenth Amendment, and that the State failed to rebut that finding." Fleming, 2001-2799 at p. 3, 820 So.2d at 469. In reviewing the State's arguments, we first set forth the factual basis for those claims, and then outline the legal framework within which those facts must be analyzed.
In 1998, when Defendants were indicted, former La.C.Cr.P. art. 413(C) provided:
In the parish of Orleans, the court shall select twelve persons plus a first and second alternate for a total of fourteen persons from the grand jury venire, who shall constitute the grand jury. The court shall thereupon select one of the jurors to serve as foreman.
La.C.Cr.P. art. 413(C)(repealed by La. Acts 2001, No. 281). Pursuant to this provision, both the grand jury members and the foreperson that indicted Defendants were selected by Orleans Parish Criminal District Court Judge Terry Alarcon.
Judge Alarcon testified for the defense at the hearing on the motions to quash regarding the selection process and criteria he used in selecting those grand jurors. As noted elsewhere, he selected seven African Americans and five whites jurors, and a female African American foreperson.
Another defense witness was Dr. Joel Devine. Dr. Devine, who was qualified as an expert in sociological statistics, testified regarding the application of various statistical calculations (absolute disparity, comparative disparity, chi square test, and Fisher Exact square) to data set forth in a chart prepared by Defendants. Defendants' *119 chart correlated the race and gender of the selecting judge with that of the forepersons over the thirteen-year period from 1987 to 2000. Dr. Devine testified that the only data he received was Defendants' chart, and, on cross-examination, acknowledged that his conclusions were only as good as the data that he received. Although the State stipulated to the authenticity of the raw data on which Defendants' chart was based,[1] the State objected to the chart itself as no testimony was offered regarding how it was composed.
In its written reasons for judgment, the trial court summarized Defendants' statistical data as including the following:
 Defendants presented grand jury records, voter registration data, affidavits and statistics showing 25 grand jury forepersons were selected between 1987 and 2000 by Orleans Parish Criminal District Court judges.[2]
 The statistical data revealed between 1987 and 2000, white judges selected whites as forepersons 74% of the time and blacks as forepersons 26% of the time, even though whites comprised an average of 44% of the registered voters in Orleans Parish (white registered voters in Orleans Parish decreased from 47% in 1987 to 32% in 2000) and blacks comprised an average of 58% of the registered voters in Orleans Parish (black registered voters in Orleans Parish increased from 53% in 1987 to 64% in 2000). Thus, whites were over-represented as forepersons by 30% and blacks were underrepresented by 32%.
 Black judges selected blacks as forepersons 83% of the time and whites as forepersons 17% of the time.
 Male judges selected males as forepersons 64% of the time even though males only comprised an average of 43% of registered voters in Orleans Parish. Male judges selected females as forepersons 36% of the time even though females comprised an average of 57% of the registered voters in Orleans Parish. Thus, female forepersons were underrepresented by 21%.
Given the State's failure to present any rebuttal evidence, the trial court appointed its own expert, Dr. Silas Lee, to examine Defendants' statistical data. Dr. Lee, who was qualified as an expert in statistics and sociological impact of statistics, opined that based on the numbers he saw "a pattern whereby white judges select a white as a foreperson and black judges select a black as a foreperson," showing a preference based on race and gender. He further opined that such discrimination or exclusion sometimes "happens automatically." In his written report, Dr. Lee concluded that judges are not immune from social categorization and discrimination.
Based on the above facts, the trial court found the Defendants' statistical evidence demonstrated a prima facie case of discrimination in the selection of grand jury forepersons from 1987 to 2000, in violation of the equal protection and due process clauses. We separately address those constitutional violations.

*120 Equal Protection Violation

To demonstrate an equal protection violation based on discrimination in the selection of the grand jury itself or the foreperson, a defendant is required to establish a prima facie case of purposeful discrimination. Under the seminal case, Castaneda v. Partida, 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977), a prima facie showing of purposeful discrimination is established by proving "over a significant period of time" that "substantial under-representation" has occurred of a "recognizable distinct class, singled out for different treatment under the laws." Sara Sun Beale, et al, Grand Jury Law & Practice § 3:12 (2d ed. 2003)("Grand Jury"). One method of establishing such purposeful discrimination is by satisfying the following three-prong test:
1. Those alleged to be discriminated against belong to an identifiable group in the general population.
2. The selection process is subject to abuse according to subjective criteria.
3. The degree of underrepresentation, as shown by comparing the proportion of the group at issue found in the general population to the proportion called to serve.
State v. Divers, 34,748, p. 12 (La.App. 2 Cir. 6/22/01), 793 So.2d 308, 316, writ denied, 2001-2544 (La.8/30/02), 823 So.2d 937 (citing Castaneda, supra).
Applying that analysis to the facts of this case, the first two prongs are not at issue. First, it is undisputed that African Americans and women are both identifiable groups capable of being singled out for disparate treatment. Second, it is undisputed that the procedure in Orleans Parish under former La.C.Cr.P. art. 413(C) for selecting both the grand jury itself and the foreperson was subject to abuse according to subjective criteria that could include race and sex. Hence, the dispute is whether Defendants established the third prong, which requires a statistical showing of substantial under-representation over a substantial period of time.
Both sides argue that it is not necessary to resort to a statistical showing of under-representation in this case. The State argues that since the grand jury that indicted Defendants constituted a fair representation of the Orleans Parish registered votersseven African American and five white jurors and an African American, female forepersonDefendants suffered no constitutional injury. That argument is unpersuasive. The equal protection clause "forbid[s] the exclusion of cognizable or distinct groups from the jury pool;" it does "not require that each individual jury mirror the composition of the community." Grand Jury, supra. at § 3:12.
Defendants argue that resort to a statistical showing of under-representation to indirectly establish purposeful discrimination is unnecessary because there is direct evidence of such discrimination in the selection of the grand jury through the testimony of the jury selector, Judge Alarcon. More particularly, they contend that Judge Alarcon's testimony supports a finding of discrimination through a system of exclusion by limited inclusion and establishes that he employed a quota system based on his knowledge of Orleans Parish demographics. We find Defendants' reliance on Judge Alacon's testimony to support an equal protection violation is misplaced for two reasons.
First, Defendants' characterization of Judge Alarcon's testimony as establishing he engaged in a quota system in selecting the grand jury is unsupportable. The gist of Judge Alarcon's testimony was that this was the first grand jury he selected as a newly elected judge. As a recent candidate, *121 he was aware of the demographics of Orleans Parish. He was concerned that the African American population as well as males and females were represented on the grand jury. He expressly denied engaging in any type of scientific method of selection. He testified that he "basically looked for a balance on the Grand Jury that was consistent with the Orleans Parish demographics." Responding to defense counsel's question if, in selecting the grand jury, he would replace an excluded African American male with another African American male to take his place, Judge Alarcon testified that he did not. Rather, he testified that as the juror's came in, the grand jury "gradually kind of took on a shape of its own." He further testified that the racial makeup of the grand jury was not his "primary factor" and that what he looked for was "fair, honest, intelligent people."
Although Judge Alarcon candidly acknowledged that he was concerned about race and gender and attempted to achieve a balance on this grand jury, that type of concern is not discriminatory. Indeed, in Brooks v. Beto, 366 F.2d 1, 23 (5th Cir. 1966), the court explained the logical necessity of such an awareness of race and gender, stating:
To fairly represent the community, there must be an awareness of the make-up of that community. Even random selection from broad lists, such as voter registration records, ... inescapably requires a basic preliminary test: do each, or all, or some, give a true picture of the community and its components? Of course that condition precedent may be satisfied only by testing this `sample' against the known componentsracial, economic, sociological, educational, etc. It is inevitable, therefore, that jury selectors be conscious of those components.
Id. Consequently, Judge Alarcon's admission that he was conscious of the racial and gender components of Orleans Parish demographic representatives was not an admission of discrimination in selecting this grand jury.
A somewhat similar issue was addressed in Ramseur v. Beyer, 983 F.2d 1215 (3rd Cir.1992). In that case, the selecting trial judges mentioned that they employed race as a factor in an effort to pick a fair cross section of the community and to achieve "an even mix of people from background and races, and things like that." Ramseur, 983 F.2d at 1228. While finding this type of subjective sorting according to race objectionable, the federal court reasoned that it could not conclude it amounted to an equal protection violation because "it apparently was not motivated by a desire to discriminate purposefully against African-Americans, nor was it apparently an attempt expressly to limit the number of African-Americans" on the grand jury. Ramseur, 983 F.2d at 1228. Continuing, the federal court concluded that the judges' statements did not demonstrate a desire to limit proportionately the number of African-American jurors to a fixed figure, nor did those statements indicate the presence of purposeful, invidious discrimination. Rather, the court found the judges "apparently wished the non-invidious objective of a representative jury." Ramseur, 983 F.2d at 1229. By analogy, Judge Alarcon's testimony cannot be construed to constitute direct evidence of the jury selector's discriminatory intent or purpose sufficient to establish an equal protection violation.
The other reason Defendants' reliance on Judge Alarcon's testimony is misplaced is because his testimony addressed only the selection of the grand jury itself, not the forepersons. The trial court's finding of an equal protection violation, however, *122 is based on the selection of the forepersons. "This distinction is important in that while the treatment of discrimination as to the grand jury foreperson is given the same legal consequence as discrimination as to the entire grand jury, each matter is treated as a separate legal issue for the purposes of litigation." Divers, 34,748 at p. 8, 793 So.2d at 314. "[A]lthough the selection of grand jury forepersons is regarded in the same manner as the selection of grand jurors, the federal and state courts have always considered those to be two separate issues." Divers, 34,748 at pp. 7-8, 793 So.2d at 314. Hence, while the same standards are applied, separate analyses are required.
Acknowledging and addressing this distinction, the trial court at a hearing on the motions to quash questioned defense counsel regarding whether their challenge was to the selection of the entire grand jury or only the foreperson.[3] Defense counsel replied that their evidence was designed to cover both issues; Judge Alarcon's testimony was designed to establish discrimination in selecting the grand jury, and Dr. Devine's testimony was designed to establish discrimination in selecting the foreperson. Again, for the reasons discussed above, we find Defendants' reliance on Judge Alarcon's testimony to support an equal protection violation in selecting the grand jury itself misplaced.
Shifting our focus to the selection of the foreperson, the trial court was persuaded by Defendants' statistical evidence showing that in twenty-five of the thirty-one grand juries selected during the thirteen-year period (1987 to 2000), there was a correlation between the race and gender of the selecting judge and the race and gender of the individual selected as grand jury foreperson. Based on that evidence, the trial court found Defendants established a prima facie case of discrimination in the selection of forepersons during that period. We find Defendants' statistical evidence factually and legally flawed.
Factually, Defendants' statistical evidence was flawed because it was drawn from incomplete data. Of the thirty-one forepersons selected during that thirteen-year period, the races of six and the sexes of four forepersons were unknown. As the State stresses, these unknowns make it impossible to determine the disparity between the African Americans and female forepersons as compared to the African Americans and females in the voter registration population. Moreover, as the State argues, it is quite possible that "the missing data could prove no disparity at all in the race and gender of the forepersons." It is important to note that this is not a case in which there were no African American or female forepersons on the grand jury during the relevant period. Rather, the record reflects (as shown in Defendants' chart from which the statistical data was derived) that the known statistical data showed there were ten African American and eleven female forepersons over the thirteen-year period.
Legally, as the State asserts, the focus of Defendants' statistical evidence on the selecting judge's race and gender is misplaced; the selecting judge's race and gender are irrelevant to an equal protection analysis. The equal protection clause does not protect individuals from having a judge of a particular race or gender select a *123 foreperson of a particular race or gender; it protects individuals from being excluded from serving as grand jury forepersons because of their race or gender.
Although the state and federal jurisprudence has held that there is no magic formula for determining whether individuals of a certain race or gender have been under-represented, the jurisprudence has employed the following single method to evaluate a defendant's statistical evidence regarding jury exclusion:
A determination is made first of the percentage of the relevant general population composed of the particular group or class allegedly singled out for discriminatory treatment. A similar finding must then be made of the percentage of the same group or class represented in grand jury venires or the office of grand jury foreperson. Finally, the two figures are compared, and if the result reveals a significantly large disparity, then there arises a presumption of discrimination.
Bryant v. Wainwright, 686 F.2d 1373, 1376 (11th Cir.1982). In this case, as noted above, Defendants' statistical evidence departed from that single method, and focused instead on the race and gender of the selecting judge. Resort to a comparison of the percentages derived by Defendants, using this method, with the percentages discussed in the jurisprudence, which generally were derived using the method described above, would be akin to comparing apples and oranges. See Grand Jury, supra. at § 3:18 (noting that "most courts continue to employ the absolute disparity standard," which is the difference between the percentage of the population in the specified category and the percentage of the jurors that are in that category). We thus decline to engage in such a comparison.
Regardless, the jurisprudence holds that, even assuming such a comparison reflects a substantial disparity, courts must "look beyond the figures to other criteria such as the number of years involved, the size of the sampling, and the number of the class in the general population." Bryant, 686 F.2d at 1377. "The magnitude of a disparity may also depend on whether the statistics are based on one grand jury venire of thirty people, or on dozens of grand jury venires representing thousands of people." Id. Applying these factors to Defendants' statistical evidence in this case logically leads to the conclusion that the magnitude of the statistical disparity reflected in Defendants' chart and Dr. Devine's statistical calculations was due largely to Defendants' division of the data into irrelevant subcategories based on the selecting judge's race and gender. Given that flaw in Defendants' statistical data coupled with the admitted incomplete nature of that data, the trial court's finding that Defendants established a prima facie case of discrimination in the selection of the forepersons is not supported.
In sum, we find Defendants failed to satisfy their burden of establishing a prima facie case of purposeful discrimination as to the selection of either the grand jury itself or the foreperson. The trial court thus erred in finding an equal protection violation.

Due Process Violation
Nor does the jurisprudence support a finding that Defendants' due process rights were violated by the selection of forepersons in Orleans Parish during the time period. Although the trial court mentions a due process violation, it does not expressly address that violation. On appeal, the State argues that because the foreperson was selected from the ranks of the already seated grand jurors and because the foreperson's function in Louisiana *124 is largely ministerial in nature, Defendants' due process claim is precluded by Hobby v. United States, 468 U.S. 339, 104 S.Ct. 3093, 82 L.Ed.2d 260 (1984). Defendants counter that Hobby is not controlling.
Under former La.C.Cr. Pro. art. 413(C), the foreperson in Orleans Parish was not selected from the general venire; rather, as in Hobby the foreperson was selected from the already empaneled grand jury. The procedure in Orleans Parish, however, was different from the one involved in Hobby and Campbell v. Louisiana, 523 U.S. 392, 118 S.Ct. 1419, 140 L.Ed.2d 551 (1998), cited by Defendants, in that it was the trial judge that selected the entire grand jury. Although Hobby involved a randomly selected federal grand jury and this case involves a grand jury handpicked by the trial judge, that distinction does not dictate a different result. Given the nature of the selection of the foreperson in Orleans Parish at the time and the ministerial nature of that position, we find merit in the State's argument that Hobby precludes a due process claim based on the selection of the forepersons.
In Mosley v. State, 983 S.W.2d 249 (Tex. Crim.App.1998), the Texas court analogized the argument regarding discrimination in selecting the foreperson to discrimination in the selection of other clerical employees who perform ministerial duties, stating: "[o]ne would not contend, for example, that a defendant's conviction should be reversed because of the discriminatory selection of a clerk who file-stamps court documents, a bailiff present in the courtroom during trial, or a court coordinator who arranges hearings and trials on the docket." Mosley, 983 S.W.2d at 256.[4] We find this analogy insightful, and are persuaded that Hobby is applicable to this matter and precludes Defendants' due process claim.

DECREE
For the foregoing reasons, we reverse the trial court's decision quashing the indictments of Mr. Fleming and Mr. Trainor and remand for further proceedings.
REVERSED AND REMANDED.
ARMSTRONG, J., CONCURS.
BAGNERIS, J., DISSENTS WITH REASONS.
ARMSTRONG, J., CONCURS.
I respectfully concur in the decision to reverse the judgment of the trial court.
BAGNERIS, J., Dissents with Reasons.
I respectfully dissent from the majority opinion for the following reasons;
On September 3, 1998, the defendants were charged by bill of indictment with first-degree murder in violation of La. R.S. 14:30. On July 11, 2001, the trial court quashed the indictment, finding: (1) that the defendants presented a prima facie case of discrimination in the selection of grand jury forepersons in violation of the due process and equal protection clauses of the United States Constitution's Fourteenth Amendment and the Louisiana Constitution's Article I, §§ 2 and 3[1]; and (2) *125 that former La.C.Cr.P. art. 413(C) was unconstitutional as a local or special law in violation of La. Const. Art. III, § 12. Vol. XII, p. 1692-1700.
The state appealed this ruling, asserting that the Louisiana Supreme Court had jurisdiction pursuant to Article V, § 5(D)(1) of the Louisiana Constitution. The court, however, found that it lacked jurisdiction under Article V, § 5(D)(1), vacated the ruling of the trial court declaring La.C.Cr.P. art. 413(C) unconstitutional as a local or special law under La. Const. Art. III, § 12(a)(3), and transferred the case to this court for further proceedings as an appeal by both the state and the defendants on all other grounds properly raised in the Louisiana Supreme Court. See State v. Fleming, 2001-2799, p. 1, 5-6 (La.6/21/02), 820 So.2d 467, 470. This appeal follows.

STATEMENT OF FACT
The following is adapted from the Louisiana Supreme Court's opinion in State v. Fleming, 2001-2799 (La.6/21/02), 820 So.2d 467. On July 7, 1998, Kevin Wooldridge was murdered at his French Quarter residence during the course of an armed robbery. The defendants were subsequently arrested and indicted by an Orleans Parish Grand Jury for his murder. The defendants filed motions to quash the indictment, arguing that former La.C.Cr.P. art. 413(C)[2], governing the selection of grand jurors in Orleans Parish, was unconstitutional.
In the State's Motion to Quash, the defendants asserted that La.C.Cr.P. art. 413(C) was unconstitutional on several grounds: (1) the statute did not provide for random selection of grand jury forepersons in violation of their Fourteenth Amendment Due Process and Equal Protection rights; (2) the statute was unconstitutional as a local or special law in violation of La. Const. Art. III, § 12; and (3) the statute excluded felons from grand jury service in violation of state and/or federal constitutional rights. The trial court held several hearings on the matter. The most relevant evidence the trial court reviewed included the records of the makeup of Orleans Parish grand juries from 1987-2000, the testimony of the judge who presided over the grand jury that issued the indictment in this case, and the testimony of two expert witnesses. State v. Fleming, 2001-2799, p. 1-3 (La.6/21/02), 820 So.2d 467, 469.
The following is a detailed summary of all witness testimony by hearing date. The first hearing on the motions to quash was held on August 4, 2000 for the purpose of determining the location of grand jury records from 1960 to the present and to introduce evidence of historical discrimination in the grand jury selection process. At this first hearing, the following witnesses testified: Josephine Windhorst, Edwin Lombard, Alfred Speer, Numa Bertel, *126 Kevin Boesha, Greg Voigt, Roger Jordan, and Joseph Marcel. Josephine Windhorst, the Orleans Parish Jury Commissioner, testified that as Custodian of Jury Records in Orleans Parish she possessed the names of all jurors who served on grand juries since 1986, with the exception of the then sitting grand jury. Her records, however, did not indicate the race of any of the grand jurors. Ms. Windhorst was later called to testify as the only witness at a hearing on March 16, 2001 regarding the procedure for selecting grand juries in Orleans Parish under former La. R.S. 413(C). She admitted that persons were excluded if they had served within five years.[3] Ms. Windhorst also testified that if the potential grand juror thought he or she had a felony record, regardless of the date of conviction and without assurance that the charge was a felony or a conviction resulted, he or she would be excused.[4] Edwin Lombard testified that as the Clerk of Criminal Court for Orleans Parish, he has no records related to the selection of grand jurors. Alfred Speer, Clerk of the Louisiana House of Representatives, testified regarding the legislative history of the amendments to La.C.Cr. P. art. 413, in particular section B, in response to a recent United States Supreme Court case disapproving of the grand jury foreperson selection process in Louisiana[5].
A number of former and current Orleans Parish prosecutors testified next. Numa Bertel, a former Orleans Parish prosecutor, testified that he could recall only one grand jury with more than one black member during the years 1967 or 1968 through 1973 when he worked with grand juries. Kevin Boesha, a former Orleans Parish prosecutor, testified that he recalled the grand juries with whom he worked during the years 1984 through 1988 were composed of a mix of African-Americans and Caucasians. Next, Greg Voigt, an Orleans Parish prosecutor, testified that in response to a discovery request in a prior case, he had located transcripts in an offsite District Attorney storage warehouse that contained the names but not the races of grand jurors from 1957 through 1964.
Roger Jordan, an Orleans Parish prosecutor, testified that during the time he worked with grand juries, from 1991 through 1993 and 1996 through 1998, the procedure in the office was to keep a folder of notes on each grand jury while empanelled and to retain those notes for a couple of years thereafter before disposing of them. Mr. Jordan clarified that the notes were considered work product, not official records of the grand juries such as would be maintained by a custodian of records. Lastly, Joseph Marcel, a former Orleans Parish prosecutor, testified as to *127 various personal observations during his time with the District Attorney's Office from 1967 to 1968, and he acknowledged that he had never assisted in any grand jury proceeding or selection.
The next hearing was held on March 30, 2001, with Judge Terry Q. Alarcon, Dr. Joel Devine, Shirley Dennis, Delays Brock, and Ernesta Bastian testifying. The purpose of this hearing was to determine how the defendants' grand jury in the instant case was selected; to present statistical evidence of under representation of African-Americans and women over a significant period of time; and to present evidence regarding unlawfully excluded grand jurors. Judge Alarcon testified that he was the judge who selected the grand jury that indicted the defendants in the instant case, and he described the criteria he used. Although Judge Alarcon testified that the racial composition of the grand jury was not his main concern, he admitted that he was aware of and concerned with the racial and gender composition of the grand jury and attempted to match his conception of the demographics of Orleans Parish.
Dr. Joel Devine was called as an expert in sociological statistics to present statistical evidence of under representation of African-Americans and women over a significant period of time. During both voir dire and examination, the state attempted to discredit Dr. Devine on methodology because he did not collect the data that he interpreted in his testimony. Dr. Devine, and the defense, clarified that he has previously been accepted as an expert in sociological statistics and that interpretation of presented data was the accepted methodology. In addition, the trial court confirmed with Dr. Devine that he had no reason to doubt the credibility of the data presented and confirmed with the defense that the raw data was contained in the record.
Dr. Devine testified based on a chart prepared by the defense regarding the percentage of time judges in Orleans Parish selected grand jury forepersons of their own race and gender and the resulting overrepresentation of white males. The raw data for the chart consisted of the Orleans Parish grand jury records from 1987-2000, which the defendants had obtained from the Orleans Parish Criminal District Courts, the Jury Commissioner of Orleans Parish Criminal Court, and the Registrar of Voters in Orleans Parish. The defendants aggregated the records and compiled charts for each grand jury term during the thirteen-year period the records covered, each of which contained the name, race, and gender of each grand juror who served in Orleans Parish during that term. The racial identities of 85 grand jurors, including 6 forepersons, were not ascertained.
The chart about which Dr. Devine testified was verbally described as follows: in column one, the race of the judge selecting the grand jury foreperson: in column two, the race of the selected grand jury foreperson; in column three, a percentage based on the raw numbers from column two; in column four, data regarding registered voters in Orleans Parish as representative of the general population of Orleans Parish called for grand jury duty; and in column five, a percentage known as the "departure from the expected," which is, simply, a difference of the percentage observed relative to the registered voter tally presented. This type of quantitative data summarizing the raw data, sometimes accompanied by photocopies of the raw data, is typical of the material Dr. Devine has testified from as an expert witness in sociological statistics.
Dr. Devine then testified regarding the methodology (used in this and two other such hearings in which he was qualified as *128 an expert witness) and the results of his analysis. First, he testified that he found the distribution of the grand jury pool closely approximated the distribution of registered voters in Orleans Parish based on his review of statistical information for registered voters, for each person summoned for grand jury duty, and for each selected grand juror. Next, Dr. Devine testified about how the numbers are analyzed. Certain data are known and provide a certain population or characteristic (the population parameter), and in some cases, the actual distribution is not fully known, requiring certain assumptions to be employed. In either case, he ascertains whether certain observed patterns fit the question being asked with respect to either the known population parameter or certain assumed sampling distribution properties. The result is referred to as the departure from the expected. The methodology then continues with the statistician evaluating the result to determine if it is the result of chance. The accepted numerical indicator of a result being the product of chance is.05 or one in twenty.
Dr. Devine went on to describe the chi square formula as a statistical tool used on categorical or nominal data to examine an observed versus an expected distribution. In the instant case, Dr. Devine used the chi square formula to compare the race of grand jury forepersons and the selecting judges in Orleans Parish from 1987-2000. Dr. Devine also explained the Fisher Exact test as the chi square variation that is employed in a two by two contingency table where one has two different variables and each of those variables has two states or conditions, hence two by two. Dr. Devine then testified regarding his analysis of the figures, which were derived from the evidence in the record and provided by the defense on the chart. First, he explained that "absolute disparity," a column heading on the chart, means "absolute difference", in the sense of subtracting one number from another without standardizing the number.
In the instant case, the chart reflects 54% African-American registered voters but only 26% African-American forepersons selected by Caucasian judges, resulting in an absolute disparity of28% (54% minus 26%) or a 28% under representation. The term "comparative disparity"[6] was then described as the proportion of the group eliminated from grand jury service versus the expected result. The result of the comparative disparity under representation analysis was over 50%. As for discrimination based on gender, Dr. Devine testified that he made his calculation based on given data that male judges selected male forepersons on sixteen grand juries and women on only nine grand juries; and that males account for 43% of registered voters and women account for 57% of registered voters in Orleans Parish. The result was an absolute disparity of 21% fewer females than expected. The comparative disparity under representation would then be 37% for women. A calculation could not be made regarding gender based on the selections of female judges because the total number of forepersons selected was too small to be statistically significant.
As for his application of the data in the instant case to the chi square test, Dr. Devine testified that he utilized a simplifying assumption of a 50% African American *129 and 50% Caucasian grand jury pool, as opposed to the purported actual figures of 54% and 44% respectively. This assumption rendered Dr. Devine's figures more conservative than if he had used the actual percentages. Vol. IV, p. 534. Dr. Devine also concluded, based on a result of 0.2253 on the Fisher Exact Test, that the probability of the overrepresentation of white persons as grand jury forepersons being a function of chance was one in fifty.
On cross-examination, Dr. Devine admitted that his analysis was only as good as the data presented. Dr. Devine clarified that the assumptions he used were intrinsic to the process, not a whim of the statistician. The percentage of registered voters was clarified as an average over the thirteen year time period, to make the figures more conservative. Regarding the grand jury that indicted the defendants in the instant case, Dr. Devine stated that the end result of seven African-Americans and five Caucasians would be more consistent with his expectations based on the population dynamic. On redirect, Dr Devine concluded that the statistical composition of the indicting grand jury in the instant case reflected as closely as possible the percentages of African-Americans and Caucasians on the voter rolls.
Exhibits were then entered into evidence. The state reiterated that it previously stipulated to the authenticity of the raw data from which the chart was comprised, but objected to the chart itself. Prior to the start of the hearing, the state stipulated to the "criminal jury records in Orleans Parish", the records from "the registrar of voters", and "certain criminal court records" but not those from Judge Alarcon. The state objected to the records for all other purposes and to the chart itself, as no testimony was offered regarding how it was composed.
The next three witnesses testified regarding how they were excused from grand jury service based on their answers to the question on the grand juror summons regarding "legal trouble." Shirley Dennis, a black female who received a demand to appear for grand jury service two days before the March 30, 2001 hearing, testified that she answered "shoplifting" in response to a question regarding legal problems and was sent home without further investigation or explanation. The defense examined Ms. Dennis and determined that she was wrongly excluded: the incident occurred fifteen to twenty years ago; the amount in question was less than five hundred dollars; and there was no evidence of a conviction. Delays Brock, a black male, testified regarding his experience in 1998 in answering the question regarding "charges" and the notation that he had pending a charge for "stolen property" when he did not have any such charge pending and, in fact, had a prior firearms conviction that may have been a misdemeanor at the time. Lastly, Ernesta Bastian, a black female who was summoned for the Spring 1999 grand jury, testified that she was excused from grand jury service without further investigation or clarification when she admitted that she had had pled guilty to theft eleven or twelve years prior and was placed on probation for five years.
At the June 22, 2001 hearing, Dr. Silas Lee, a sociologist the trial court appointed as its own expert, testified that the trial court asked him to evaluate the evidence and statistics presented by the defendants and report to the court on his statistical analysis. His written report concluded that judges are not immune from social categorization and discrimination.

DISCUSSION
STATE'S ASSIGNMENT OF ERROR NUMBER 1
The state first argues that the trial court erred in quashing the indictment *130 against the defendants because the defendants did not suffer any constitutional injury, as the body of individuals comprising the grand jury that indicted them constituted a fair representation of the Orleans Parish community.[7] That is, the selecting judge did not deny that he was conscious of the racial and gender makeup of the grand jury but consciousness of race was not used to exclude, but rather to include, to constitute a fair representation of qualified grand jurors in Orleans Parish. The state cites Brooks v. Beto, 366 F.2d 1, 27 (5th Cir.1966) in support of its argument. The state claims that, as a result, there was no evidence of substantial under representation of a recognizable class or race presented to the trial court; and the trial court did not doubt that the selecting judge exercised his discretion in good faith and without abuse. The state argues that without injury, quashal was inappropriate.
The defendants argue[8] that the fact that an African-American female was selected as the grand jury foreperson does not automatically dispose of the claim of discrimination. The issue, argue the defendants, is whether a prima facie case of discrimination was presented and whether the state failed to rebut the defendants' showing. This issue will be discussed below in the state's assignment of error number two.
The state's reliance on Brooks is misplaced, as the nuances of later cases limit its usefulness. In Brooks, the court held that purposeful inclusion of an African-American on a grand jury is permissible to remedy historic discrimination while assuring a fair community representation. Brooks, 366 F.2d 1, 28. Two years later in Goins v. Allgood, 391 F.2d 692 (5th Cir. 1968), the same court focused on the following cautionary words found in Brooks itself:
Goins' present application for habeas corpus called attention to Collins v. Walker, 5 Cir.1964, 335 F.2d 417. Under the Collins decision, it would have been unconstitutional for two Negroes to be chosen on the grand jury of twelve on the basis of their race. Collins was overruled in Brooks v. Beto, supra, but Brooks left in full force the closely related principle that there must be no exclusion through a system of limited inclusion. See [Brooks,] 366 F.2d at 21. In the emphatic words of Brooks: `The dual requirements making awareness of race inevitable must be met, but this must never, simply never, be done as the means of discrimination. It must never, simply never, be applied to secure proportional representation. It must never, simply never, be applied to secure a predetermined or fixed limitation.' *131 Goins, 391 F.2d 692, 699 [emphasis added]. The state inappropriately has focused on the achievement of a fair representation of Orleans Parish in this particular grand jury, and the state's argument fails on the closely related principle that there must be no exclusion through a system of limited inclusion. The defendants are correct that the real issue is whether the evidence establishes a prima facie case of discrimination by a system that allows consciousness of race. The trial court made no findings regarding the indicting grand jury in the instant case, but it appears that the indictment could be quashed on the basis of exclusion through inclusion in light of Goins. The defendants raised this issue in the trial court and in their brief, and this court could affirm quashal of the indictment in the instant case on this ground alone in the interest of judicial economy. As a result, this court would not need to reach the issue of systematic exclusion over time.
The state's first argument can also be interpreted as a standing argument: without injury, these defendants' indictment should not have been quashed. The United States Supreme Court in Campbell v. Louisiana, 523 U.S. 392, 400, 118 S.Ct. 1419, 1424, 140 L.Ed.2d 551 (1998), held that a white criminal defendant had third party standing to raise an equal protection challenge to discrimination against African-Americans in the selection of his grand jury. The court concluded that "[r]egardless of his or her skin color, the accused suffers a significant injury in fact when the composition of the grand jury is tainted by racial discrimination." Campbell, 523 U.S. 392, 398, 118 S.Ct. 1419, 1423, 140 L.Ed.2d 551. The grand jury is tainted because "the impartiality and discretion of the judge himself would be called into question." Campbell, 523 U.S. 392, 399, 118 S.Ct. 1419, 1424, 140 L.Ed.2d 551. As in Campbell, the defendants in the instant case allege that the composition of the grand jury was tainted because race was a factor in the selecting judge's composition of the grand jury. Inasmuch as the state appears to challenge the defendants' right to bring an equal protection claim of discrimination in the grand jury selection process under former La.C.Cr.P. 413(C), this claim is without merit.
STATE'S ASSIGNMENT OF ERROR NUMBER 2
The state next argues that the trial court erred in finding that the defendants established a prima facie case of discrimination in the selection of Orleans Parish grand jury forepersons from 1987-2000. To establish a prima facie case of discrimination in the selection of grand jurors and foremen, the defendants had to demonstrate:
(1) That the group against whom discrimination is asserted is a distinct class, singled out for different treatment;
(2) The degree of underrepresentation of the group in the total population to the proportion called to serve as foremen over a significant period of time; and
(3) That the selection procedure is susceptible to abuse or is not racially neutral.
Johnson v. Puckett, 929 F.2d 1067 (5th Cir.1991) and State v. Langley, XXXX-XXXX, p. 23 (La.4/3/02), 813 So.2d 356, 371 (Langley III), citing Castaneda v. Partida, 430 U.S. 482, 494, 97 S.Ct. 1272, 1280, 51 L.Ed.2d 498 (1977). The three essentials for establishing a prima facie case of discrimination under the fourteenth amendment are the same whether it concerns discrimination in the selection of grand jury venires or discrimination in the selection of grand jury forepersons. Bryant v. *132 Wainwright, 686 F.2d 1373, 1375 (11th Cir. 1982).
Unless contrary to law, rulings of the trial court in pretrial matters are generally shown great deference absent a clear showing of an abuse of discretion. State v. Prudholm, 446 So.2d 729 (La.1984); State v. Walters, 408 So.2d 1337 (La.1982). Accordingly, the standard of review is whether there is a clear showing that the trial court abused its discretion in making its findings that the defendants established a prima facie case of purposeful discrimination, and that the state failed to rebut that presumption. The mechanics of this standard of review of a trial court's order quashing an indictment for discrimination against African-Americans and women in the selection of the grand jury foreperson was recently outlined as follows:
Our analysis requires not only the consideration of significant absolute disparities but also other criteria such as the number of years involved, the size of the sampling, and the number of the class in the general population, in order to obtain the most accurate and complete picture of the disparity in the context of the totality of the circumstances.
State v. Kennedy, 02-214, 10, (La.App. 5 Cir. 06/26/02), 823 So.2d 411, 417.
In its order quashing the indictment against the defendants, the trial court properly first found African-Americans and women to be identifiable groups capable of being singled out for disparate treatment. State v. Langley, XXXX-XXXX, p. 23 (La.04/03/02), 813 So.2d 356, 371. The court next summarized the statistical evidence presented and made the following findings, in pertinent part:
The statistical data revealed between 1987 and 2000, white judges selected whites as forepersons 74% of the time and blacks as forepersons 26% of the time, even though whites comprised an average of 44% of the registered voters in Orleans Parish and blacks comprised an average of 58% of the registered voters in Orleans Parish. Thus whites were over-represented as forepersons by 30% and blacks were underrepresented by 32%.

* * *
White judges selected blacks as forepersons 26% of the time while blacks comprised an average of 58% of the registered voters in Orleans Parish.
Black judges selected blacks as forepersons 83% of the time and whites as forepersons 17% of the time.
Male judges selected males as forepersons 64% of the time even though males only comprised an average of 43% of registered voters in Orleans Parish. Male judges selected females as forepersons 36% of the time even though females comprised an average of 57% of the registered voters in Orleans Parish.
Thus, female forepersons were underrepresented by 21%.
Third, the trial court found that although Judge Alarcon acted in good faith in the selection of this jury, the former La. C.Cr.P. art. 413(C) "is devoid of an objective race/gender neutral selection criteria, and is pregnant with the opportunity to foster racial/gender discrimination." Thus, the third prong of the Johnson analysis was satisfied, as "a judge could well select an all white, all black, all male, or all female grand jury/foreperson."
Once a defendant establishes a prima facie case of discrimination, the burden shifts to the state to show that the pattern of under representation proved was the result of a racially neutral selection procedure. Guice v. Fortenberry, 722 F.2d 276, 280 (5th Cir.1984) (Guice II). The state offered no evidence, and the trial *133 court found that the state "failed to rebut by evidence an objective, racially neutral criteria which is not subject to abuse, was used in the selection process."
Direct Evidence
The defendant may prove discriminatory intent or purpose either by proving it directly from the intention of jury selectors or inferentially through evidence of systematic exclusion over a significant period of time. Akins v. Texas, 325 U.S. 398, 403-404, 65 S.Ct. 1276, 1279, 89 L.Ed. 1692 (1945). The state argues that the testimony of the selecting judge was not sufficient direct evidence of discriminatory animus, as it was merely an admission of inclusion of African-Americans to avoid discrimination. Inclusion of a race or gender to avoid discrimination, the state argues, is not sufficient to show an equal protection violation in the selection of a grand jury. Brooks v. Beto, 366 F.2d 1 (5th Cir.1966).
The defendants argue that the testimony of the selecting judge that he was conscious of race during the grand jury selection process was direct evidence of discriminatory animus. Judge Alarcon admitted that he actively took race and gender into account in selecting the grand jury that indicted the defendants and indulged in a kind of quota system because he felt he knew the demographics of Orleans Parish:
I was aware and I was concerned that the African-American population, as well as male and female, as best as I could, be represented on this Grand Jury. It was not a scientific undertaking. I basically looked for a balance on the Grand Jury that represented, in my humble opinion, with Orleans Parish demographic representatives.
The voter registration population (i.e., the jury pool) at the time the defendants' grand jury was selected was 59 per cent African-American, and Judge Alarcon selected seven out of twelve black grand jurors, which would be 58.3 per cent of the grand jury. As Dr. Devine agreed, this "would be as close as you could get to it in terms of handpicking the 12 jurors.... `It's a simple mathematical operation, one could not get closer.'" The hand selection of a grand jury by quota is not a virtue, conclude the defendants, but a fundamental flaw in the system. Judge Alarcon acted with good intentions, but the system is susceptible to abuse because it is a race conscious selection process. Although in the context of race based admissions to law school, the Fifth Circuit has held that any consideration of race or ethnicity for the purpose of achieving diversity is not a compelling interest under the Fourteenth Amendment. Hopwood v. Texas, 78 F.3d 932, 944 (5th Cir.1996), citing Adarand Constructors, Inc. v. Pena, 515 U.S. 200, 227, 115 S.Ct. 2097, 2112-2113, 132 L.Ed.2d 158 (1995) (holding that all governmental racial classifications must be analyzed by reviewing court under strict scrutiny and are constitutional only if narrowly tailored to further compelling governmental interests) and Richmond v. Croson, 488 U.S. 469, 493, 109 S.Ct. 706, 722, 102 L.Ed.2d 854 (1989) (warning that classifications based on race carry danger of stigmatic harm and should be reserved for remedial settings).
The defendants are correct that discriminatory animus may be shown by the direct admission that race was a consideration in the selection of a grand jury or grand jury foreman, even if that consciousness resulted in inclusion of African-Americans: "An accused is entitled to have charges against him considered by a jury in the selection of which there has been neither inclusion nor exclusion because of race." Holland v. Illinois, 493 U.S. 474, 510-511, 110 S.Ct. 803, 823, 107 L.Ed.2d 905 (1990), citing Ex parte Virginia, 100 *134 U.S. 339, 345, 25 L.Ed. 676 (1880); Strauder v. West Virginia, 100 U.S. 303, 25 L.Ed. 664 (1880); Cassell v. State of Texas, 339 U.S. 282, 287, 70 S.Ct. 629, 632, 94 L.Ed. 839 (1950). The trial court, however, quashed the indictment based on the statistical data, not on selecting judge's admission of consciousness of race and gender.
Statistical Evidence
The state argues that the defendants failed to provide sufficient evidence of systematic exclusion to establish a prima facie case of discrimination in the grand jury selection process. Systematic exclusion generally requires numerical evidence to demonstrate substantial under representation of a recognizable class over a significant period of time, within a system susceptible to abuse, that is not due to chance or accident. Castaneda, 430 U.S. 482, 494, 97 S.Ct. 1272, 1280. The most common method employed to demonstrate substantial under representation compares the percentage of registered voters to the percentage of those individuals selected for service. Castaneda, 430 U.S. 482, 494, 97 S.Ct. 1272, 1280. That is, a determination is made first of the percentage of the relevant general population composed of the particular group or class allegedly singled out for discriminatory treatment. Bryant v. Wainwright, 686 F.2d 1373, 1377 (11th Cir.1982). A similar finding must then be made of the percentage of the same group or class represented in grand jury venires or the office of grand jury foreperson. Bryant, 686 F.2d 1373, 1377. Finally, the two figures are compared, and if the result reveals a significantly large disparity, then there arises a presumption of discrimination. Bryant, 686 F.2d 1373, 1377. As the court in Bryant cautioned, however, there is no magic formula that can be applied to every factual situation in resolving the question of discrimination:
Exact mathematical standards have never been developed, nor should they be. Such a mechanical approach would be too rigid for the wide variety of circumstances and unique factual patterns of discrimination cases arising under the Equal Protection Clause. See Alexander v. Louisiana, 405 U.S. 625, 630, 92 S.Ct. 1221, 31 L.Ed.2d 536 (1972). As a result, courts have addressed each case on an individual basis.
Bryant, 686 F.2d 1373, 1377. An exact proportion of the population is not mandated; rather, the Constitution requires only that the grand jury constitute a fair, representative body of the community from which it is selected. Akins, 325 U.S. 398, 403, 65 S.Ct. 1276, 1279. A system of selection that is susceptible to abuse, one in which discretion is provided, is not per se unconstitutional. Akins, 325 U.S. 398, 65 S.Ct. 1276.[9]
Sufficiency of the Statistics
The state makes two arguments regarding the sufficiency of the statistics presented. First, the state alleges that the data presented to the court was incomplete. Second, the state alleges that the relevant data does not show substantial under representation of a recognizable class or race over a period of time. The state concludes that the missing data could prove that there was no disparity in the race and gender of forepersons when compared to the Orleans Parish voter registration population.
(1) Completeness and Accuracy of the Data
The state first argues that the trial court's findings were based on incomplete *135 data purporting to indicate that judges tend to select members of their own race and gender more often as forepersons than persons of a different race or gender. From 1987-2000, 14 Caucasians and 11 African-Americans were forepersons; the race of the remaining 6 forepersons remains unknown. During the same time period, 15 males and 12 females were forepersons; the gender of 4 forepersons remains unknown. The state argues that the missing data could prove no disparity at all in the race and gender of the forepersons selected during the period 1987-2000 in Orleans Parish.
The state relies on Rose v. Mitchell, 443 U.S. 545, 99 S.Ct. 2993, 61 L.Ed.2d 739 (1979). In Rose, the court found insufficient the defendant's proof of substantial under representation of African-American grand jury forepersons due to the lack of evidence of the total number of forepersons appointed during the relevant time period because the absence of evidence made it impossible to determine whether the lack of African-Americans was statistically significant enough to make a case of discrimination or whether it was due to chance or accident. Rose, 443 U.S. 545, 571, 99 S.Ct. 2993, 3008 (citing Castaneda). The evidence in Rose, however, contrasts sharply with that offered in the instant case. In Rose, the evidence consisted of the testimony of the trial judge, three jury commissioners, and three former grand jury foremen, none of which provided numerical information on the number of forepersons actually appointed, the race of each foreperson, or on the method used to select the forepersons. Rose, 443 U.S. 545, 570-571, 99 S.Ct. 2993, 3007-3008
In the instant case, the missing data was acknowledged and the issue addressed during the examination of Dr. Lee, the Court's appointed expert. Dr. Lee testified that missing data ("unknowns") is not unusual in statistical analysis, and while it should be noted, it is not a bar to meaningful conclusions. Numbers alone can be deceiving, Dr. Lee testified, and meaning is drawn from numbers when they are compared to other numbers: in this case, the meaning was drawn from a correlation of race and gender between the selecting judges and the grand jury forepersons over a significant period of time. Therefore, we conclude that the trial court did not err in accepting the data as complete and accurate enough to draw meaningful conclusions.
(2) Showing of under representation
The state next argues that trial court compounded its error in relying on incomplete data when it found discrimination by correlating the race and gender of the selecting judges to the race and gender of those selected as grand jury forepersons during the period 1987-2000. The jurisprudential test for a prima facie case of discrimination, argues the state, focuses only on the race and gender of those individuals fulfilling the role of grand jury forepersons, rather than the selector of the foreperson.
As a preliminary matter, it should be noted that the state, in addition, questions the validity of the trial court findings:
From this data, the court inexplicably concludes that Caucasians were over represented as forepersons by 30% and African-Americans underrepresented by 32%. No data is given on the total number of African-Americans and Caucasians appointed as forepersons during this period. In particular, the court does not consider the numbers of African-Americans appointed as forepersons by African-American judges. Without this total number, it is impossible to *136 determine the degree of under representation, if any.
This argument does not have merit. The state correctly points out one numerical error in the trial court's findings: the correct absolute disparity (under representation) of African-Americans as forepersons was 28% according to the testimony of Dr. Devine and the table incorporated into the defendants' brief. The state, however, is incorrect on another point: the trial court did consider the numbers of African-Americans appointed as forepersons by African-American judges and found that "Black judges selected blacks as forepersons 83% of the time and whites as forepersons 17% of the time."
As for the validity of the methodology used by the defense and the trial court to find under representation, the trial court's summary of the statistics was derived from the evidence presented by the defendants, the calculations performed by Drs. Devine and Lee, and reflects a methodology approved recently by the Louisiana Supreme Court:
"... [t] he combination of gross population statistics, voter registration rolls, and a profile of jurors who actually sat on grand juries that convened .... provided the district court with a reliable measure for computing on the basis of absolute disparities the degree of under-representation of women and African-Americans in the position of foreperson on grand juries in Calcasieu Parish and for drawing an inference of discriminatory intent therefrom."
Langley III, XXXX-XXXX, p. 21, 813 So.2d 356, 370. Census data (gross population statistics) was presented to the trial court, although the voter registration rolls were selected as most reflective of the population qualified for grand jury service. The record also includes detailed information on the grand jurors actually called as well as those actually selected for service. Therefore, the defendants provided the trial court with a reliable measure for computing on the basis of absolute disparities the degree of under representation of African-Americans and women as grand jury forepersons in Orleans Parish. The fact that the analysis was broken down by correlating the race and gender of the selecting judge and the forepersons selected does not disqualify the methodology, as there is no one magic formula for doing such calculations.
The question then becomes one of numbers: did the defendants show significant enough disparities? The Louisiana Fifth Circuit recently summarized the disparities that other courts have found and their significance:
In Langley III [,] the absolute disparity [sufficient to establish a prima facie case of discrimination under Castaneda] from the percentage of grand jury members to the percentage of African-American forepersons ranged from 15.5% to 15.9%. With respect to women, the absolute disparity was 25.4%.
* * *
The court [in Bryant ] reviewed various ranges as follows:
For example, in Turner v. Fouche, 396 U.S. 346, 90 S.Ct. 532, 24 L.Ed.2d 567 (1970), the evidence established that in 1968 sixty percent of Taliaferro County, Georgia, was black, although the same class represented only thirty-seven percent of the grand jury. The Court had no difficulty in concluding that a disparity of twenty-three percentage points in any given year was too large to be explained by any reason other than discrimination. Turner v. Fouche, 396 U.S. at 359, 90 S.Ct. at 539. Likewise, in Whitus v. Georgia, 385 U.S. 545, 87 S.Ct. 643, 17 *137 L.Ed.2d 599 (1967), there was a significant disparity of over thirty points in the percentage of blacks in the general population of Mitchell County, Georgia, and the percentage of blacks on the county's grand and petit jury venires. In contrast, in Swain v. Alabama, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965), a difference of only ten percentage points was not sufficient to establish a prima facie case of discrimination.

* * *
Thus, the significant disparities noted in Bryant range from 23% to 30%. See also Ramseur v. Beyer [983 F.2d 1215, 1232 (3rd Cir.1992), cert denied, 508 U.S. 947, 113 S.Ct. 2433, 124 L.Ed.2d 653 (1993)] (14.1% is of borderline significance); United States v. Hawkins [661 F.2d 436, 442 (5th Cir.1981), cert. denied, 456 U.S. 991, 102 S.Ct. 2274, 73 L.Ed.2d 1287 (1982)] (1.75% to 5.45% not significant).

Langley III [2002 La. Lexis 965, pp. 42-43, 813 So.2d 356] noted the following significant range from 14.7% to 40.1%:
Compare Castaneda v. Partida, 430 U.S. at 495-96, 97 S.Ct. at 1280-1281... (absolute disparity of 40.1%); Turner v. Fouche, supra [396 U.S. 346, 90 S.Ct. 532, 24 L.Ed.2d 567 (1970)] (absolute disparity of 23%); Whitus v. Georgia, 385 U.S. 545, 87 S.Ct. 643, 17 L.Ed.2d 599 (1967) (absolute disparity of 18%); Jones v. Georgia, 389 U.S. 24, 88 S.Ct. 4, 19 L.Ed.2d 25 (1967) (absolute disparity of 14.7%).
Kennedy, 02-214, p. 10-11, 823 So.2d 411, 417-418 (footnotes containing citations omitted and citations added to text). As for the outcome of the Kennedy case itself, the defendant was found to have failed to establish a prima facie case of discrimination in the selection of grand jury forepersons in Jefferson Parish during the time period 1988-1998:
In the present case, the absolute disparity for African-Americans selected as forepersons for the 10-year period ranges from 7.12% to0.78%, a figure that is far below the 15.5% to 15.9% absolute disparity in Langley III. The figure is also far below the absolute disparities noted by the Langley III court in other cases that ranged from 14.7% to 40.1%. Regarding women serving as forepersons, the absolute disparity for the 10-year period ranges from 13.4% to 17.21%, absolute figures that fall partially within the Langley III range as significant.
Kennedy, 02-214, p. 9-10, 823 So.2d 411, 416 (footnote omitted).
In sum, absolute disparities significant enough for state and federal courts to find an equal protection violation for discrimination in the selection of grand juror forepersons range from 40.1% to 14.7%, with 14.1% borderline and 1.75% to 5.45% not significant. The trial court in the instant case found an absolute disparity of 32% for African-Americans, although that appears to be a typographical error based on the evidence supporting a figure of 28%, and 21% for women. Substantively, the results of the numerical analysis in the instant case are well within the parameters established in prior cases. Thus the trial court properly found that the defendants satisfied the second prong of the Johnson analysis.
The trial court's finding that the defendants satisfied the third prong of the analysis takes on additional meaning given the state's argument that the correlation of the race and gender of the selecting judges to that of the grand jury foreperson was inappropriate.

*138 The third factor of the prima facie test, establishment that the selection process is susceptible to abuse, can also affect the gravity of the disparity. A selection process which can be easily maneuvered in a discriminatory fashion is more likely to give rise to a presumption of discrimination than a selection process which would be difficult, but not impossible, to manipulate. Thus, in Alexander v. Louisiana, 405 U.S. 625, 92 S.Ct. 1221, 31 L.Ed.2d 536 (1972), the Court held that a disparity of only fourteen percentage points supported a prima facie case of discrimination, but emphasized the ease with which jury commissioners could have used their procedures for discrimination. The goal of this entire balancing process is, of course, to eliminate chance or inadvertence as a cause of the disparity; the statistical evidence must convince the court that discrimination is the only reasonable explanation.
Bryant, 686 F.2d 1373, 1377. The statistical analysis in the instant case intended to show and did show the ease with which the selecting judge could have used the process for discrimination, whether intentional or unintentional due to social conditioning. As the trial judge pointed out, the grand jury foreperson selection process in Orleans Parish, prior to the recent change, was ripe with possibility for discrimination.
STATE'S ASSIGNMENT OF ERROR NUMBER 3
Lastly, the state argues that the trial court erred in quashing the indictment against these defendants based on due process grounds concerning the selection of Orleans Parish grand jury forepersons when the foreperson is selected from the ranks of already seated grand jurors, and the role of the foreperson in Louisiana is largely ministerial in nature. The state relies on Hobby v. U.S., 468 U.S. 339, 104 S.Ct. 3093 (1984) in support of this argument.[10] The defendants rely on Campbell, 523 U.S. 392, 400, 118 S.Ct. 1419, 1424 to argue that the role of grand jury foreperson in Louisiana is not ministerial and any discrimination in the selection of the foreperson must be treated as discrimination in the selection of the grand jury itself.
First it must be noted that the trial court in the instant case couched its legal and factual findings on equal protection grounds and did not make any specific findings of law or fact regarding the defendants' due process claim. The United States Supreme Court in Campbell noted:
It is unnecessary here to discuss the nature and full extent of due process protection in the context of grand jury selection. That issue, to the extent it is still open based upon our earlier precedents, should be determined on the merits, assuming a court finds it necessary to reach the point in light of the concomitant equal protection claim.
Campbell, 523 U.S. 392, 401, 118 S.Ct. 1419, 1424-1425. Therefore, it may not be necessary to address this claim.
Substantively, the state's argument may have merit, although the question is a close *139 one. First, Hobby is not controlling in this case. In Hobby, the grand jury foreperson was selected from a random panel to perform strictly ministerial duties, and the Court held that "[g]iven the ministerial nature of the position, discrimination in the selection of one person from among the members of a properly constituted grand jury can have little, if indeed any, appreciable effect upon the defendant's due process right to fundamental fairness." Hobby, 468 U.S. 339, 345, 104 S.Ct. 3093. The court acknowledged, however, that the role of the federal grand jury foreperson might significantly differ from the role of the grand jury foreperson appointed by individual states. Hobby, 468 U.S. 339, 342, 104 S.Ct. 3093.
The United States Supreme Court in Campbell evaluated the application of Hobby to the Louisiana grand jury selection system that allowed the trial judge to subjectively select the grand jury foreperson:
The Louisiana Supreme Court erred in reading Hobby to foreclose Campbell's standing to bring a due process challenge. [Campbell,] 661 So.2d, at 1324. In Hobby, we held discrimination in the selection of a federal grand jury foreperson did not infringe principles of fundamental fairness because the foreperson's duties were "ministerial." See Hobby, supra, at 345-346, 104 S.Ct., at 3096-3097. In this case, the Louisiana Supreme Court decided a Louisiana grand jury foreperson's duties were ministerial too, but then couched its decision in terms of Campbell's lack of standing to litigate a due process claim. [Campbell,] 661 So.2d, at 1324.
The Louisiana Supreme Court was wrong on both counts. Its interpretation of Hobby is inconsistent with the implicit assumption of standing we have just noted and with our explicit reasoning in that case. In Hobby, a federal grand jury foreperson was selected from the existing grand jurors, so the decision to pick one grand juror over another, at least arguably, affected the defendant only if the foreperson was given some significant duties that he would not have had as a regular grand juror. See [Campbell] supra, at 1422. Against this background, the Court rejected the defendant's claim because the ministerial role of a federal grand jury foreperson "is not such a vital one that discrimination in the appointment of an individual to that post significantly invades" due process. Hobby, supra, at 346, 104 S.Ct., at 3097. Campbell's challenge is different in kind and degree because it implicates the impermissible appointment of a member of the grand jury. See [Campbell] supra, at 1422. What concern Campbell is not the foreperson's performance of his duty to preside, but performance as a grand juror, namely voting to charge Campbell with second-degree murder.
The significance of this distinction was acknowledged by Hobby's discussion of a previous case, Rose v. Mitchell, 443 U.S. 545, 99 S.Ct. 2993, 61 L.Ed.2d 739 (1979). In Rose, we assumed relief could be granted for a constitutional challenge to discrimination in the appointment of a state grand jury foreperson. See id., at 556, 99 S.Ct., at 3000. Hobby distinguished Rose in part because it involved Tennessee's grand jury system. Under the Tennessee law then in effect, 12 members of the grand jury were selected at random, and then the judge appointed a 13th member who also served as foreperson. See Hobby, 468 U.S., at 347, 104 S.Ct., at 3097-3098. As a result, Hobby pointed out discrimination in selection of the foreperson in Tennessee was much more serious than in the federal system because the former can affect the composition *140 of the grand jury whereas the latter cannot: "So long as the grand jury itself is properly constituted, there is no risk that the appointment of any one of its members as foreman will distort the overall composition of the array or otherwise taint the operation of the judicial process." Id., at 348, 104 S.Ct., at 3098. By its own terms, then, Hobby does not address a claim like Campbell's.
Campbell, 523 U.S. 392, 401-403, 118 S.Ct. 1419, 1424-1425 (emphasis added). Likewise, the defendants' claim in the instant case differs from the claim made in Hobby and is akin to that made in Campbell. The defendants here challenge the manner in which the grand jury and its foreperson are selected and specifically allege that the process distorts the composition of the grand jury.
As the Fifth Circuit recently pointed out, the Campbell decision was actually dictated by Hobby itself:
The Hobby foreperson had been selected under North Carolina law from an already-impaneled grand jury and his or her further duties were merely "ministerial." In Campbell, however, Louisiana law specified that the foreperson be selected by the judge of the case from the grand jury venire before the remaining grand jurors were selected by lot and impaneled. Therefore, the foreperson was selected not merely to conduct ministerial duties, but was also selected to act as a voting member of the grand jury, a vote that directly impacted the defendant. To the extent that such a selection was made discriminatorily, it ran afoul of the Hobby implied assumption of due process. The Court's decision in Campbell was therefore dictated by its opinion in Hobby.

Peterson v. Cain, 302 F.3d 508, 514-515 (5th Cir.2002). Hobby was rooted in the fact that the grand jury was randomly selected and the foreperson was chosen from the properly constituted grand jury. In Campbell and the instant case, the forepersons were subjectively selected as voting members of the grand jury from the venire:

Campbell provides that when the grand jury foreman is subjectively picked from the grand jury pool, and the rest of the grand jury is randomly selected, this method may shape the composition of the grand jury. We must then look to the racial makeup of the grand jury to see if the discriminatory selection of the foreman did adversely affect the racial makeup of the grand jury. That is, the method of selection of the grand jury foreperson is relevant only to the extent that it affects the racial composition of the entire grand jury.
The Court also said that, under Louisiana's grand jury selection process (La. Code Crim.P. art. 413(B)), whereby eleven grand jurors are selected by lot but the foreman (who is the twelfth grand juror) is selected by the judge, a claim of discrimination in the selection of the grand jury foreman must be treated as a claim of discrimination in the selection of the grand jury itself. [Campbell,] 118 S.Ct. at 1422. As a result, the fact the role of the grand jury foreman is "ministerial" does not defeat a discriminatory selection claim under the version of article 413 which was in effect when relator's grand jury was selected. The test is whether a properly constituted grand jury exists. Cf. Hobby v. United States, 468 U.S. 339, 345-46, 104 S.Ct. 3093, 3097, 82 L.Ed.2d 260 (1984).
State ex rel. Roper v. Cain, 1999-2173, p. 2, (La.App. 1 Cir. 10/26/99), 763 So.2d 1, 2-3.
It is clear that even if the office of grand jury foreperson is ministerial, the analysis *141 does not end. It is also clear that Hobby is not controlling, as the foreperson in Orleans Parish was not selected from a randomly selected grand jury and, as a result, there can be no implied assurance of due process. The only question is whether the analysis for a due process violation differs from that for an equal protection violation, such that the defendants' evidence regarding substantial under representation of grand jury forepersons is insufficient to show that the grand jury was improperly constituted. The record contains the relevant data regarding the grand jury as a whole for the time period, but the defendants presented analysis regarding the selection of grand jury forepersons only. While this evidence is sufficient for an equal protection claim, the due process test articulated in State ex rel. Roper v. Cain, 1999-2173, p. 2, (La. App. 1 Cir. 10/26/99), 763 So.2d 1, 2-3, whether a properly constituted grand jury exists, may not be satisfied by the grand jury foreperson evidence alone. On the other hand, the defendants may be correct that the end result of the due process analysis in this case could be an analysis of the grand jury foreperson statistics, with the discriminatory selection of that one person distorting and tainting the entire grand jury. Accordingly, if this court reviews the due process claim, the state's argument on this issue may have merit.
TRAINOR'S ASSIGNMENT OF ERROR NUMBER 1
The defendant Trainor makes two assignments of error. Trainor first argues that the state waived its right to appeal the decision of the trial court by failing to call a single witness or present any evidence of a neutral non-discriminatory reason for the evidence presented. This argument is without merit. First, La. C.Cr.P. art. 912(B)(1) provides that the state may appeal judgments or rulings on a motion to quash an indictment or any count thereof.
Second, the defendant Trainor mischaracterizes the burden shifting in the instant case. The state vigorously objected at all hearings, and on cross-examination of Judge Alarcon, Dr. Devine, and Dr. Lee, the state attempted to bring forth a race neutral reason for the results of the selection process. The state asserts, and is correct, that the trial court reserved ruling on whether the defendants had established a prima facie case of discrimination until the written order quashing the indictment was rendered.
Lastly, after vacating the trial court's ruling that the former 413(C) was a special law, the Louisiana Supreme Court specifically allowed both the state and the defendants to appeal the trial court's order "all other grounds properly raised in this court." Fleming, 2001-2799, p. 5-6, 820 So.2d 467, 470. Therefore, this argument is without merit.
TRAINOR'S ASSIGNMENT OF ERROR NUMBER 2
Trainor next argues that the trial court committed reversible error in limiting its decision to the period 1987 through 2000. The defendant Trainor offers as proof a case, Labat v. Bennett testimony of several former and then current assistant district attorneys in Orleans Parish. The Labat case, the defendant argues, proved that discrimination had taken place between 1936 and 1966 when only one African-American was selected to serve on the grand jury and that was the result of a mistake. Westlaw was searched for the Labat case that the defendant referred in his brief was Labat v. Bennett, 365 F.2d 698, 727 (5th Cir.1966) which he asserts proved discrimination between 1936 and 1966 in the Orleans Parish grand jury selection process:

*142 The outstanding fact is that in 1953 all white juries were invariably the rule in Orleans Parish. As Justice Black pointed out in his opinion in the first Labat-Poret case: `Only once within the memory of people living in the parish had a colored person been selected as a grand juror. That juror, who happened to look like a white man, was selected under the mistaken idea that he was one.' 350 U.S. at 102, 76 S.Ct. at 165.
Labat, 365 F.2d 698, 716. The Labat court was referring to the following, as it explained earlier in its opinion:
The United States Supreme Court, on its first consideration of the case, also treated the motion to quash only as an attack on the grand jury. Labat v. State of Louisiana and Poret v. State of Louisiana, Reported with an sub nom.; Michel v. State of Louisiana, 1955, 350 U.S. 91, 76 S.Ct. 158, 100 L.Ed. 83, 92, reh. denied 350 U.S. 955, 76 S.Ct. 340, 100 L.Ed. 831. In the majority opinion, the Court stated:
`Neither (defendant) made may attack on the composition of the petit jury, but filed motions to quash their indictment claiming discrimination in the selection of the grand-jury panel.' 350 U.S. at 96, 76 S.Ct. at 162.
Labat, 365 F.2d 698, 705. The court in Labat actually held much more narrowly than the defendant asserts:
We hold that the petitioners made out a prima facie case. In 1953 and for five years before, in the Parish of Orleans the method of selecting juries failed to meet the constitutional standards adopted by this Court and the Supreme Court. The record shows systematic exclusion of Negroes from the Orleans Parish jury system.
Labat v. Bennett, 365 F.2d 698, 727.
Even had the Labat case stood for the proposition the defendant Trainor claimed, this argument would still lack merit. The statistical evidence only covered the period 1987 through 2000. As more fully outlined above, the accepted method of showing discrimination in the selection of grand jury foreman depends on the use of statistics or the admission of the selector. In addition, the testimonial evidence urged by the defendant Trainer as proof of discrimination prior to this time period is akin to the very limited evidence presented in Rose and found to be woefully insufficient.
In addition, after vacating the trial court's ruling that the former 413(C) was a special law, the Louisiana Supreme Court specifically allowed both the state and the defendants to appeal the trial court's order on "all other grounds properly raised in this court." Fleming, 2001-2799, p. 5-6, 820 So.2d 467, 470. The "other grounds properly raised" were the equal protection and due process claims. The trial court did not make findings regarding the time period prior to 1987, but this issue, apparently, was not brought before the Louisiana Supreme Court. As this court's review was limited by the Louisiana Supreme Court to "all other grounds properly raised in this court", the issue appears to be beyond this court's scope of review. The state urges dismissal of Trainor's appeal, but this does not appear to be necessary, as the arguments lack merit.

CONCLUSION
For the reasons set forth above, I would affirm the trial court's quashal of the defendants' indictment, basing this court's decision solely on the selecting judge's admission of race consciousness in the selection of the grand jury and foreperson in the instant case. Even though the trial court did not base quashal on the admitted defect in the defendants' grand jury, remand does not appear necessary or in the *143 interest of judicial economy, as the evidence that the trial court would consider to make that ruling is currently before this court.
Further, it should be noted that nothing in this opinion should be interpreted as preventing the state, in its discretion, from obtaining a superseding indictment to cure any potential or perceived defect in the present indictment.
NOTES
[1] The raw data for that chart consisted of the Orleans Parish grand jury records from 1987 to 2000, which was obtained from the Orleans Parish Criminal District Courts, the Jury Commissioner of the Orleans Parish Criminal Court, and the Registrar of Voters in Orleans Parish.
[2] Although there were actually thirty-one forepersons chosen during the thirteen-year period, the trial court referred to only twenty-five forepersons, apparently due to the missing data for the remaining six.
[3] The trial court noted that since under former La.C.Cr.P. art. 413(C) both the grand jury and the foreperson were selected in the same manner, a practical problem would be posed if a ruling was made limited solely to the foreperson. The problem is that if discrimination tainted the foreperson selection, then the discrimination arguably also tainted the selection of the entire grand jury.
[4] In Mosley, the Texas court extended Hobby to an equal protection claim, albeit noting the federal jurisprudence to the contrary.
[1] The trial court applied the three-prong test in Johnson v. Puckett, 929 F.2d 1067 (5th Cir.1991), discussed infra, to find that the defendants had established a prima facie case of discrimination in the selection of the grand jury foreperson. Trial Court's Ruling, Vol. XII, p. 1695.
[2] Prior to its repeal by Acts 2001, No. 281, § 2, Article 413(C) provided:

In the parish of Orleans, the court shall select twelve persons plus a first and second alternate for a total of fourteen persons from the grand jury venire, who shall constitute the grand jury. The court shall thereupon select one of the jurors to serve as foreman. (Emphasis added.)
In parishes other than Orleans, Article 413(B) provided for a different method of selecting grand juries:
In parishes other than Orleans, the court shall select one person from the grand jury venire to serve as foreman of the grand jury. The sheriff shall draw indiscriminately and by lot from the envelope containing the remaining names on the grand jury venire a sufficient number of names to complete the grand jury. The envelope containing the remaining names shall be replaced into the grand jury box for use in filling vacancies as provided in Article 415. (Emphasis added.)
[3] The five-year rule was known as the "Judge McKay Exception". Rule XXV, § 2 of the Rules of the Supreme Court of Louisiana reads as follows: "The jury commission shall not include in, and shall delete from, the general venire the names of those persons who have served as grand or petit jurors in criminal cases or as trial jurors in civil cases or in a central jury pool during a period of two years immediately preceding their selection for jury service; individual district courts may increase this two year period to a four year period by local rule of court. However, if the name of such a person is included in a general venire, that person may claim an exemption from jury service or may waive the exemption."
[4] See La. C. Cr.P. art. 401(5), which provides that to qualify as a juror, a person must "[n]ot be under indictment for a felony nor have been convicted of a felony for which he has not been pardoned" and contrast with La. Const. Art. I, § 20, which provides that "[f]ull rights of citizenship shall be restored upon termination of state and federal supervision following conviction for any offense."
[5] See Campbell v. Louisiana, 523 U.S. 392, 118 S.Ct. 1419 (1998).
[6] "Comparative disparity is calculated by dividing the absolute disparity by the population figure for a population group. It measures the diminished likelihood that members of an under represented group, when compared to the population as a whole, will be called for jury service." State v. Kennedy, 02-214, p. 12 (La. 5 Cir. 06/26/02), 823 So.2d 411, 418, citing Ramseur v. Beyer, 983 F.2d 1215, 1232 (3rd Cir.1992).
[7] The grand jury in question was comprised of seven African-Americans, five Caucasians, eight females, and four males. The foreperson was a female African-American.
[8] The state makes three assignments of error, and the defendants jointly filed an answer brief. In their answer brief, however, the defendants do not specifically respond to the three issues raised by the state. Rather, the defendants make five arguments, several of which the trial court specifically pretermitted, and one (the special law ruling) the Louisiana Supreme Court vacated. Accordingly, the arguments of the defendants do not correspond to the assignments of error by the state, and this summary is this writer's best attempt to correlate assignments and arguments. The defendants' arguments regarding the pretermitted issues of improper exclusion of qualified persons from serving (the Judge McKay exception, felons, and those convicted of misdemeanors) and the now vacated ruling of the trial court regarding former La.C.Cr.P. 413(C) as a special or local law will not be addressed in this recommendation, as these issues are beyond the scope of review for this court. La.C.Cr. P. arts. 911 and 920; Uniform Rules of Louisiana Courts of Appeal, Rule 1-3.
[9] The Akins case would be an example of a grand jury selection scheme in which the jury commission was vested with great discretion in the selection of the grand jury. The constitutionality of the scheme was evaluated as applied, not on its face.
[10] In Hobby, the United States Supreme Court held that, even if discrimination was a factor in the selection of federal grand jury forepersons, such discrimination did not constitute a violation of the due process clause of the Fifth Amendment justifying reversal of the petitioner's conviction or the dismissal of the indictment. In reaching its conclusion, the court examined the role of the foreperson in a federal grand jury and found it to be insignificant because "discrimination in the selection of one person from among the members of a properly constituted grand jury can have little, if indeed any, appreciable effect upon the defendant's due process right to fundamental fairness." Hobby, 468 U.S. 339, 345, 104 S.Ct. 3093.